**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Isidro UBALDO–FIGUEROA,**
**Defendant–Appellant.**

No. 01–50376.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 12, 2003.

Filed Oct. 17, 2003.

Steven F. Hubachek, Federal Defenders of San Diego, Inc., (argument) and Wendy S. Gerboth, San Diego, CA, (brief), for the defendant-appellant.

Shanna L. Dougherty, Assistant United States Attorney, San Diego, CA, for the plaintiff-appellee.

Before: PREGERSON, REINHARDT, and ARCHER,* Circuit Judges.

PREGERSON, Circuit Judge:

In this appeal, we address challenges concerning the retroactivity of two provisions of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"). First, we consider a due process challenge to the retroactive application of IIRIRA § 321, which broadened the definition of deportable offenses classified as "aggravated felonies." Congress *expressly* made the broadened definition retroactive.

Second, we consider the retroactive reach of IIRIRA § 304, which eliminated the discretionary relief from deportation available under former INA § 212(c). Congress *was silent whether the elimination of § 212(c) relief applied retroactively to people who were convicted of crimes before 1996.*

We AFFIRM in part and REVERSE in part.

## FACTUAL AND PROCEDURAL HISTORY

### *Statutory Scheme*

In 1996, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub.L. No. 104–208,

---

* The Honorable Glenn L. Archer, Jr., Senior Circuit Judge for the United States Court of Appeals for the Federal Circuit, sitting by designation.

110 Stat. 3009–546 ("IIRIRA"), and the Antiterrorism and Effective Death Penalty Act of 1996, Pub L. No. 104–132, 110 Stat. 1214, ("AEDPA"). Together, these acts substantially changed the criteria for removal[1] of Legal Permanent Residents (LPRs) and the availability of possible relief from removal for LPRs. Relevant to this case, IIRIRA brought about two changes that affected petitioner Isidro Ubaldo–Figueroa.

First, effective April 1, 1997, IIRIRA § 304 repealed Immigration and Nationality Act ("INA") § 212(c), 8 U.S.C. § 1182(c) (1994 ed.), which provided certain deportable aliens with relief from deportation. Former INA § 212(c) permitted the Attorney General to waive deportation for immigrants who had been convicted of a crime classified as an "aggravated felony."[2]

Second, IIRIRA and AEDPA broadened the definition of "aggravated felony" in 8 U.S.C. § 1101(a)(43), to encompass burglary offenses for which a term of at least one-year imprisonment was imposed. IIRIRA § 321(a)(3); 8 U.S.C. § 1101(a)(43)(G) (1994 ed., Supp V.). Previously, the crime of burglary did not constitute an "aggravated felony" unless the term of imprisonment was at least five years.[3] 8 U.S.C. § 1101(a)(43) (1994 ed.). See St. Cyr, 533 U.S. at 295 n. 4, 121 S.Ct. 2271 ("While the term [aggravated felony] has always been defined expansively, it was broadened substantially by IIRIRA."). Aggravated felonies defined under § 1101(a)(43) are criminal offenses that serve as a ground for removing an alien from the United States.

Congress expressly stated that the new definition of crimes that constitute "aggravated felonies" under IIRIRA § 321 shall apply retroactively. IIRIRA § 321(b) (the expanded definition of "aggravated felony" applies "regardless of whether the conviction was entered before, on, or after the date of enactment of this paragraph."). Such retroactive application made a significant number of legal immigrants deportable for crimes they committed before the enactment of IIRIRA—crimes which previously were not considered to be "aggra-

---

1. IIRIRA also changed the terminology of the INA. "In IIRIRA, Congress created proceedings—with different names and slightly different requirements—that paralleled the pre-IIRIRA deportation scheme." Ram v. INS, 243 F.3d 510, 513 (9th Cir.2001). Before IIRIRA, aliens who committed aggravated felonies were placed in deportation proceedings after being served with an Order to Show Cause. Id. After IIRIRA, aliens were placed in removal proceedings after being served with a Notice to Appear. Id.

2. Former INA § 212(c) "has been interpreted by the Board of Immigration Appeals (BIA) to authorize any permanent resident alien with a lawful unrelinquished domicile of seven consecutive years to apply for a discretionary waiver from deportation," INS v. St. Cyr, 533 U.S. 289, 295, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) (emphasis added), if he or she had committed a deportable offense. In St. Cyr, the Supreme Court noted that "[t]he class of aliens whose continued residence in this country has depended on their eligibility for

§ 212(c) relief is extremely large, and not surprisingly, a substantial percentage of their applications for § 212(c) relief have been granted." Id. at 295–96, 121 S.Ct. 2271. The Court further noted that "[t]he extension of § 212(c) relief to the deportation context has had great practical importance because deportable offenses have historically been defined broadly." Id. at 295, 121 S.Ct. 2271. The repeal of § 212(c) has drastic consequences for LPRs who committed deportable offenses classified as "aggravated felonies" after IIRIRA was enacted, because they are no longer entitled to § 212(c) relief.

3. IIRIRA § 321 also expanded the aggravated felony definition to include additional offenses, including "all convictions involving fraud or deceit in which the loss to the victim exceeds $10,000 (as opposed to $200,000 pre-IIRIRA) ... [and] any 'crime of violence' resulting in a prison sentence of at least one year (as opposed to five years pre-IIRIRA)." St. Cyr, 533 U.S. at 296 n. 4, 121 S.Ct. 2271.

vated felonies." *St. Cyr*, 533 U.S. at 318–19, 121 S.Ct. 2271.

### Isidro Ubaldo–Figueroa

As a result of these retroactive changes, Ubaldo–Figueroa, a legal permanent resident of the United States, became deportable for a crime he committed three years before IIRIRA was enacted. Ubaldo–Figueroa's background, as reported in his Presentence Report, is undisputed. He was born on August 14, 1971 in Paracho, Michoacan, Mexico. After his father suffered an embolism in 1985, Ubaldo–Figueroa emigrated to this country to find work to help support his family. He was fifteen years of age. From 1985 to 1989, he worked as a field worker in various farms throughout the state of Oregon. Around 1989, Ubaldo–Figueroa moved to Orange County, California, and began work at the Rocky Mountain Water Company, in Santa Fe Springs, California. That same year, at the age of eighteen, he was granted a Special Agricultural Worker residency permit. In 1992, Ubaldo–Figueroa was granted Legal Permanent Residency status.

Ubaldo–Figueroa worked at Rocky Mountain continuously for the next eleven years as a forklift operator, truck loader, and machine operator.[4] While employed at Rocky Mountain, Ubaldo–Figueroa met and married his wife, Petra Torres–Hernandez, his co-worker at Rocky Mountain. Ms. Torres–Hernandez is a United States citizen. In 1990, Ubaldo–Figueroa and his wife had their first child, Miguel Ubaldo–Torres. In 1991, they had another child, Isidro Ubaldo–Torres. His children are both United States citizens. The record indicates that Ubaldo–Figueroa is committed to his children's education; he frequently attends parent-teacher conferences and school events. He stated that he is involved in his sons' education because he wants to provide his children with a better education than he had as a child.

In 1993, Ubaldo–Figueroa pleaded guilty to one count of attempted first degree burglary of a dwelling, in violation of Cal.Penal Code § 459 and § 664. He was sentenced to three months of home confinement and three years probation. Under the law in effect in 1993, his conviction did not render him deportable. Ubaldo–Figueroa submitted evidence that during his plea negotiations, he relied on the immigration law as it existed then to plea to an offense that would not render him deportable because he knew "[d]eportation would mean certain separation from the rest of my family. The lives of my wife and children are firmly rooted here in the United States and, as United States citizens they are eligible for opportunities and benefits that are not available to them in Mexico." On November 22, 1995, the court revoked his probation and he was sentenced to two years in state prison.[5]

### Procedural History

#### 1. Removal Proceedings

Almost five years after Ubaldo–Figueroa pleaded guilty to attempted burglary,

---

4. Ubaldo–Figueroa's supervisor at Rocky Mountain praised Ubaldo–Figueroa's work performance, stating: "Isidro has always been a good worker. He was always early to work and had an excellent attendance record. He was self-motivated and displayed excellent job knowledge and ability."

5. Following his conviction for attempted burglary, Ubaldo–Figueroa pleaded to three additional misdemeanors. On November 7, 1993, he was convicted of one count of disorderly conduct. He was sentenced to 36 months probation and 60 days in jail. On August 12, 1996, he pleaded guilty to Driving Under the Influence, for which he received three years probation and a fine. And on September 8, 1997, he pleaded guilty to two counts of disorderly conduct, for which he received 120 days in jail and three years of probation.

the INS retroactively applied the expanded deportation criteria enacted in IIRIRA § 321 to him and initiated removal proceedings against him on the basis of his 1993 attempted burglary conviction. On March 31, 1998, an Immigration Judge ("IJ") conducted a removal hearing for Ubaldo–Figueroa. During the hearing, Ubaldo–Figueroa was represented by counsel and had a Spanish language interpreter.

During the hearing, the IJ tentatively stated in English that Ubaldo–Figueroa may be eligible for § 212(h) relief; this statement was not translated into Spanish. At the end of the hearing, however, the IJ ruled that he had considered all areas of law by which Ubaldo–Figueroa may be permitted to remain in the United States and concluded that none applied. The IJ thus ordered Ubaldo–Figueroa removed to Mexico, and the INS deported him to Mexico on the same day. The IJ did not inform Ubaldo–Figueroa of his right to appeal his removal order. The IJ's only reference to an appeal was when he posed a question to Ubaldo–Figueroa's counsel: "Counsel you want to accept that as a final order or do you want to reserve an appeal?" Counsel for Ubaldo–Figueroa responded: "We'll accept it as a final order your honor." This colloquy between the IJ and Ubaldo–Figueroa's counsel, mentioning an appeal, was not translated into Spanish. The interpreter translated only three parts of the hearing for Ubaldo–Figueroa: when the IJ swore in Ubaldo–Figueroa, when the IJ asked Ubaldo–Figueroa to state his name, and when the IJ issued his final ruling. The interpreter did not translate the IJ's and his counsel's discussion regarding their agreement to change Ubaldo–Figueroa's charging document to alter the grounds on which Ubaldo–Figueroa was being removed.

## 2. District Court Proceedings

The INS twice arrested Ubaldo–Figueroa after he had been deported to Mexico and then found in the United States. First, on May 27, 2000, Ubaldo–Figueroa was arrested and charged with being a deported alien found in the United States in violation of 8 U.S.C. § 1326. This charge was dismissed, and he was returned to Mexico. On June 30, 2000, Ubaldo–Figueroa was again arrested in the United States. On July 12, 2000, a grand jury indicted Ubaldo–Figueroa in the Southern District of California charging him with two counts of being an alien found within the United States after deportation in violation of 8 U.S.C. § 1326.

Ubaldo–Figueroa filed a motion to dismiss the two count indictment. He mounted a collateral attack against his 1998 removal proceedings. Specifically, Ubaldo–Figueroa argued that his removal order was obtained in violation of his due process rights because the IJ failed to inform him of his possible eligibility for relief from deportation under § 212(c) or his right to appeal the IJ's decision. Thus, Ubaldo–Figueroa contended, he was impermissibly deprived of an opportunity to seek judicial review of his removal order. Ubaldo–Figueroa argued that he was prejudiced by the constitutional errors in his removal hearing because he could have challenged his removal order on two grounds: (1) the retroactive application of IIRIRA § 321 violated his right to due process, and (2) he was eligible for relief from removal under former INA § 212(c).

The district court held that the INS violated Ubaldo–Figueroa's due process rights because his 1998 removal proceedings were not translated into Spanish. Because the hearing was not translated, Ubaldo–Figueroa was not properly advised of the grounds on which he was being deported, his possible eligibility of relief

from deportation, or his right to appeal his removal order in violation of his right to due process of law. The district court concluded, however, that the constitutional infirmities in his removal hearing were harmless.

On January 24, 2001, a jury convicted Ubaldo–Figueroa of two counts of being an alien found in the United States after removal in violation of § 1326. On June 18, 2001, Ubaldo–Figueroa received concurrent 37 month sentences followed by three years of supervised release on each count.

### Standard of Review

We review de novo "the denial of a motion to dismiss an 8 U.S.C. § 1326 indictment when the motion to dismiss is based on alleged due process defects in an underlying deportation proceeding." *United States v. Muro–Inclan,* 249 F.3d 1180, 1182 (9th Cir.2001) (citations omitted), *cert. denied sub nom., Vidrio–Aleman v. United States,* 534 U.S. 879, 122 S.Ct. 180, 151 L.Ed.2d 125 (2001).

### DISCUSSION

### I.

 "In a criminal prosecution under § 1326, the Due Process Clause of the Fifth Amendment requires a meaningful opportunity for judicial review of the underlying deportation." *United States v. Zarate–Martinez,* 133 F.3d 1194, 1197 (9th Cir.1998), *cert. denied,* 525 U.S. 849, 119 S.Ct. 123, 142 L.Ed.2d 99 (1998). A defendant charged with illegal reentry under 8

U.S.C. § 1326 has a Fifth Amendment right to collaterally attack his removal order because the removal order serves as a predicate element of his conviction. *United States v. Mendoza–Lopez,* 481 U.S. 828, 837–38, 107 S.Ct. 2148, 95 L.Ed.2d 772 (1987) ("Our cases establish that where a determination made in an administrative proceeding is to play a critical role in the subsequent imposition of a criminal sanction, there must be *some* meaningful review of the administrative proceeding."). To sustain a collateral attack under § 1326(d), a defendant must, within constitutional limitations, demonstrate (1) that he exhausted all administrative remedies available to him to appeal his removal order, (2) that the underlying removal proceedings at which the order was issued improperly deprived him of the opportunity for judicial review, and (3) that the entry of the order was fundamentally unfair. 8 U.S.C. § 1326(d).[6] An underlying removal order is "fundamentally unfair" if: "(1) [a defendant's] due process rights were violated by defects in his underlying deportation proceeding, and (2) he suffered prejudice as a result of the defects." *Zarate–Martinez,* 133 F.3d at 1197.

We affirm the district court's holding that Ubaldo–Figueroa's underlying deportation hearing deprived him of due process because the IJ did not inform him that he had the right to appeal his removal order. The IJ also did not inform Ubaldo–Figueroa that he may be eligible for relief under former INA § 212(c). We reverse the district court's holding that Ubaldo–Figueroa

---

**6.** The statute limiting collateral review of a deportation order, 8 U.S.C. § 1326(d), provides:

In a criminal proceeding under this section, an alien may not challenge the validity of the deportation order described in subsection (a)(1) of this section or subsection (b) of this section unless the alien demonstrates that—

(1) the alien exhausted any administrative remedies that may have been available to seek relief against the order;
(2) the deportation proceedings at which the order was issued improperly deprived the alien of the opportunity for judicial review; and
(3) the entry of the order was fundamentally unfair.

was not prejudiced by the IJ's two errors because he did not have a plausible challenge to his removal order. We hold that Ubaldo–Figueroa had two plausible challenges to his removal order: (1) that the retroactive application of IIRIRA § 321 violated his right to due process under the Fifth Amendment, and (2) that he was eligible for relief under former INA § 212(c).

### 1. Exhaustion

■■■ An alien is barred under 8 U.S.C. § 1326(d) from collaterally attacking his underlying removal order as a defense to § 1326 charges "if he validly waived the right to appeal that order during the deportation proceedings." *United States v. Muro–Inclan*, 249 F.3d 1180, 1182 (9th Cir.2001), *cert. denied*, 534 U.S. 879, 122 S.Ct. 180, 151 L.Ed.2d 125 (2001) (citations omitted). The exhaustion requirement of 8 U.S.C. § 1326(d), however, "cannot bar collateral review of a deportation proceeding when the waiver of right to an administrative appeal did not comport with due process." *Id.* at 1183–84. A waiver of the right to appeal a removal order does not comport with due process when it is not "considered and intelligent." *Id.*

■■ Ubaldo–Figueroa's waiver of his right to appeal his removal order was not sufficiently "considered and intelligent" because the IJ presiding over the removal proceeding failed to inform him that he had the right to appeal his removal order

to the BIA. *Zarate–Martinez*, 133 F.3d at 1197. It is "mandatory" under the Due Process Clause that an IJ inform an alien of his or her ability to appeal a removal order during a removal proceeding. *United States v. Arce–Hernandez*, 163 F.3d 559, 563 (9th Cir.1998).

In *Zarate–Martinez*, for example, the defendant mounted a defense to his § 1326 charge by collaterally attacking his underlying deportation order on the ground that he did not make an intelligent waiver of his right to appeal that order. During removal proceedings, conducted in a group format, the IJ, through a translator, asked Zarate–Martinez and other group members: "You all understand that you *will* have the right to appeal." *Zarate–Martinez*, 133 F.3d at 1197 (emphasis in original). The group answered "yes." *Id.* Later, in an individualized hearing, the Immigration Judge asked Zarate–Martinez if he understood his rights, to which he replied "yes." *Id.* at 1198. We held, nonetheless, that the INS violated Zarate–Martinez's due process rights because his statements did not qualify as a valid waiver of his right to appeal.[7] *Id.*

The IJ who presided over Ubaldo–Figueroa's hearing gave Ubaldo–Figueroa less information about his right to appeal his removal order than did the IJ who presided over Zarate–Martinez's hearing, which we found to be constitutionally defective. Unlike the IJ in *Zarate–Martinez*, the IJ in this case did not inform

---

7. *See also United States v. Lopez–Vasquez*, 1 F.3d 751, 754 (9th Cir.1993) (holding that IJ hearing deprived petitioner's right to due process even where the Immigration Judge explained the right to appeal and provided petitioner with a form explaining his right to an appeal in Spanish because the information was given to him in a group format); *Mendoza–Lopez*, 481 U.S. at 840, 107 S.Ct. 2148 (failure of Immigration Judge to advise alien of his right to appeal and his eligibility for a

waiver of deportation violated his due process rights and "amounted to a complete deprivation of judicial review of the determination"); *United States v. Arrieta*, 224 F.3d 1076, 1079 (9th Cir.2000) (finding due process violation in § 1326 collateral appeal because in underlying proceedings Immigration Judge failed to tell defendant about his eligibility for a waiver of deportation); *United States v. Arce–Hernandez*, 163 F.3d at 563 (same).

Ubaldo–Figueroa in English or in Spanish that he had the right to appeal the Immigration Judge's decision. The IJ did not ask Ubaldo–Figueroa if he understood his right to appeal; the IJ only mentioned an appeal in the form of a question in English addressed to Ubaldo–Figueroa's counsel. That question and counsel's reply were not translated into Spanish for Ubaldo–Figueroa's benefit.[8] Thus, under *Zarate–Martinez*, Ubaldo–Figueroa's waiver of his right to appeal did not comport with due process because the IJ failed to ensure that Ubaldo–Figueroa knew that he had the right to appeal. An alien can not make a valid waiver of his right to appeal a removal order if an IJ does not expressly and personally inform the alien that he has the right to appeal.

Ubaldo–Figueroa is also exempted from the exhaustion requirement in 8 U.S.C. § 1326(d)(1) because the IJ did not inform him that he was eligible for relief from deportation. As we discuss in Section C, Ubaldo–Figueroa was eligible for a waiver from removal under former INA § 212(c). We do not consider an alien's waiver of his right to appeal his deportation order to be " 'considered and intelligent' when 'the record contains an inference that the petitioner is eligible for relief from deportation,' but the Immigration Judge fails to 'advise the alien of this possibility and give him the opportunity to develop the issue.' " *Muro–Inclan*, 249 F.3d at 1182 (quoting *United States v. Arrieta*, 224 F.3d 1076, 1079 (9th Cir.2000)). The requirement that the IJ inform an alien of his or her ability to apply for relief from removal is "mandatory," and "[f]ailure to so inform the alien [of his or her eligibility for relief from removal] is a denial of due process that invalidates the underlying deportation proceeding." *Id.* at 1183.

Thus, we hold that although Ubaldo–Figueroa did not exhaust his administrative remedies by appealing his removal order to the BIA in 1998, he is exempted from the exhaustion bar because his waiver of his right to appeal was not sufficiently "considered and intelligent" under the Due Process Clause of the Fifth Amendment.

### 2. *Deprivation of judicial review*

To sustain a collateral attack on his removal order, Ubaldo–Figueroa must also demonstrate that the "deportation proceedings at which the order was issued improperly deprived [him] of the opportunity for judicial review." 8 U.S.C. § 1326(d)(2). Based on the discussion above, we find that Ubaldo–Figueroa was deprived of the opportunity for meaningful judicial review because the IJ did not inform him of his right to appeal his deportation order. *Zarate–Martinez*, 133 F.3d at 1197.

### 3. *Prejudice*

We next consider whether Ubaldo–Figueroa was prejudiced by the due process violations in the underlying removal proceeding. To establish prejudice, Ubaldo–Figueroa does not have to show that he actually would have been granted relief. Instead, he must only show that he had a "plausible" ground for relief from deporta-

---

**8.** It is of no significance to the due process inquiry that Ubaldo–Figueroa's counsel was asked if he wanted to appeal Ubaldo–Figueroa's removal order. The due process inquiry focuses on whether Ubaldo–Figueroa *personally* made a "considered and intelligent" waiver of his appeal. *See United States v. Proa–Tovar*, 945 F.2d 1450, 1453 (9th Cir.

1991), *superseded on other grounds by* 975 F.2d 592 (9th Cir.1992) (en banc) ("While an independent decision by counsel to forego appeal of the deportation hearing may or may not raise the question of ineffective assistance, counsel's waiver will not support a finding that the detainee made a knowing and considered waiver of the right to appeal.").

tion. *Arrieta,* 224 F.3d at 1079. The district court ruled that Ubaldo–Figueroa was not prejudiced by the flaws in his underlying removal proceeding because he had no viable claims to raise on appeal from the removal order. We disagree. Ubaldo–Figueroa had two plausible legal challenges to his removal order that he could have pursued had he known that he had the right to appeal his removal order. First, Ubaldo–Figueroa makes a plausible argument that a court would have set aside his 1993 removal order because retroactively applying the expanded definition of "aggravated felony," which made him deportable for his 1993 conviction, violated his right to due process. And second, Ubaldo–Figueroa makes a plausible argument that he could have appealed his removal order because he was eligible for a waiver of deportation under INA § 212(c) under *INS v. St. Cyr,* 533 U.S. 289, 295, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001).

## A. Due Process

■ We must determine, here, whether Ubaldo–Figueroa's challenge to IIRIRA § 321's explicit retroactive reach presents a plausible ground for resisting the government's attempt to deport him. The Due Process Clause of the Fifth Amendment forbids Congress from enacting legislation expressly made retroactive when the "retroactive application [of the statute] is so harsh and oppressive as to transgress the constitutional limitation." *United States v. Carlton,* 512 U.S. 26, 30, 114 S.Ct. 2018, 129 L.Ed.2d 22 (1994) (quoting *Welch v. Henry,* 305 U.S. 134, 147, 59 S.Ct. 121, 83 L.Ed. 87 (1937)). As Justice Story observed, the Supreme Court has long disfavored retroactive statutes be-

cause "retrospective laws are, indeed generally unjust; and, as has been forcibly said, neither accord with sound legislation nor with the fundamental principles of the social compact." *Eastern Enterprises v. Apfel,* 524 U.S. 498, 533, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998) (quoting 2 J. Story, Commentaries on the Constitution § 1398 (5th ed. 1891)). Retroactive legislation "presents problems of unfairness that are more serious than those posed by prospective legislation, because it can deprive citizens of legitimate expectations and upset settled transactions." *General Motors Corp. v. Romein,* 503 U.S. 181, 191, 112 S.Ct. 1105, 117 L.Ed.2d 328 (1992). Thus, due process "protects the interests in fair notice and repose that may be compromised by retroactive legislation." *Landgraf v. USI Film Prod.,* 511 U.S. 244, 266, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1999). The Supreme Court limits retroactive statutes under the Due Process Clause as part of its longstanding "prohibition against arbitrary and irrational legislation." *Carlton,* 512 U.S. at 30, 114 S.Ct. 2018 (quoting *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 733, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984)).[9]

■ To satisfy due process, the Court requires that Congress must have enacted a retroactive statute for a legitimate legislative purpose, and retroactively applying the statute must be a rational means to accomplish Congress' purpose. *Carlton,* 512 U.S. at 31, 114 S.Ct. 2018. The constitutionality of retroactive legislation is "conditioned upon a rationality requirement beyond that applied to other legislation." *Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 223, 109 S.Ct. 468, 102 L.Ed.2d

---

**9.** The Ninth Circuit adopted the Supreme Court's due process jurisprudence regarding retroactive economic legislation in an immigration context when it analyzed whether a retroactive immigration statute comported

with due process in *United States v. Yacoubian,* 24 F.3d 1, 7–8 (9th Cir.1994). *See also Hamama v. INS,* 78 F.3d 233, 236 (6th Cir. 1996).

493 (1988) (Scalia, J., concurring) (citing *Pension Benefit Guaranty Corp.*, 467 U.S. at 730, 104 S.Ct. 2709; *Usery,* 428 U.S. at 16–17, 96 S.Ct. 2882 (1976)). Second, the period of retroactivity must be moderate and "confined to short and limited periods required by the practicalities of national legislation." *Carlton,* 512 U.S. at 32, 114 S.Ct. 2018 (quoting *United States v. Darusmont,* 449 U.S. 292, 296, 101 S.Ct. 549, 66 L.Ed.2d 513 (1981)).

The Court focuses on three primary factors in determining whether the purpose of a retroactive statute comports with due process. First, the Court looks to whether Congress applied a law retroactively to remedy a defect in previous legislation. Second, the Court examines whether Congress provided a specific rationale for applying the statute retroactively because "[t]he retrospective aspects of legislation, as well as the prospective aspects, must meet the test of due process, and the justifications for the latter may not suffice for the former." *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 17, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976). Finally, the Court considers the severity of the consequences of the retroactive legislation, including the effect of the legislation on a party's interest in fair notice and repose. *Carlton,* 512 U.S. at 31, 114 S.Ct. 2018; *Pension Benefit Guaranty Corp.,* 467 U.S.

at 731, 104 S.Ct. 2709; *Usery,* 428 U.S. at 16–17, 96 S.Ct. 2882.

In *Carlton,* for example, the Supreme Court used these principles when considering a due process challenge to a 1987 estate tax statute that Congress expressly applied retroactively to October 1986. Congress made the 1987 statute retroactive to close a loophole in a previous estate tax statute enacted in 1986, where Congress mistakenly allowed executors to prosper from "sham transactions." *Carlton,* 512 U.S. at 31–33, 114 S.Ct. 2018. Thus, the Supreme Court held that Congress enacted the provision for the constitutionally reasonable purpose of "correct[ing] what it reasonably viewed as a mistake in the original 1986 provision that would have created significant and unanticipated revenue loss." *Id.* at 32, 114 S.Ct. 2018.[10] In addition, the Court upheld the retroactive reach of the statute because Congress made it retroactive for a limited period of time. *Carlton,* 512 U.S. at 32, 114 S.Ct. 2018 ("Congress acted promptly and established only a modest period of retroactivity.").[11]

In her concurrence in *Carlton,* Justice O'Connor underscored the Court's historical practice of considering the length of the temporal reach of a retroactive statute to determine whether the statute comports with due process: "In every case in which

---

**10.** In *General Motors v. Romein,* the Court has also upheld retroactive legislation because it remedied unexpected interpretations of prior law. 503 U.S. 181, 112 S.Ct. 1105, 117 L.Ed.2d 328 (1992) (Michigan statute requiring employers to retroactively refund withheld worker's compensation benefits does not offend due process because it corrected the unexpected results of an incorrect Michigan Supreme Court interpretation of state law).

**11.** *See also Pension Benefit Guaranty Corp.,* 467 U.S. at 731, 104 S.Ct. 2709 (retroactive statute that created liability for employers that withdrew from ERISA plans did not violate due process in part because Congress

limited its retroactive reach to five months); *Welch v. Henry,* 305 U.S. at 146–48, 59 S.Ct. 121 (tax statute that retroactively imposed a tax on corporate dividends to two years prior to enactment did not violate due process in part because Congress passed statute as soon as it met after the tax year ended); *Quarty v. United States,* 170 F.3d 961 (9th Cir.1999) (upholding statute challenged on due process grounds that modified federal estate and gift tax rates and expressly provided that these rates apply retroactively because the statute's period of retroactivity was limited to eight months).

we have upheld a retroactive federal tax statute against a due process challenge ... the law applied retroactively for only a relatively short period prior to enactment." *Carlton,* 512 U.S. at 37–38, 114 S.Ct. 2018 (O'Connor, J., concurring) (citing *United States v. Hemme,* 476 U.S. 558, 562, 106 S.Ct. 2071, 90 L.Ed.2d 538 (1986) (1 month); *United States v. Darusmont,* 449 U.S. at 294–295, 101 S.Ct. 549 (10 months); *United States v. Hudson,* 299 U.S. 498, 501, 57 S.Ct. 309, 81 L.Ed. 370 (1937) (1 month)). Justice O'Connor emphasized that due process prohibits non-time limited retroactive legislation out of respect for the repose and expectations of a party affected by a retroactive statute: "The governmental interest in revising the tax laws must at some point give way to the taxpayer's interest in finality and repose." *Carlton,* 512 U.S. at 37–38, 114 S.Ct. 2018 (O'Connor, J., concurring).

The Court has also upheld retroactive statutes against due process challenges when they operate retroactively to spread the costs of a current social problem. In *Usery,* for example, the Court considered a due process challenge to a statute that required coal mine operators to compensate former employees disabled by pneumoconiosis, even if those employers no longer worked in the coal industry when the statute was enacted. The Court upheld the statute because "the imposition of liability for the effects of disabilities bred in the past is justified as a rational measure to spread the costs of the employees' disabilities to those who have profited from the fruits of their labor—the operators and the coal consumers." *Usery,* 428 U.S. at 18, 96 S.Ct. 2882. *See also Pension Benefit Guaranty Corp.,* 467 U.S. at 730–31, 104 S.Ct. 2709.

Five years ago, a majority of the Court in *Eastern Enter. v. Apfel,* 524 U.S. 498, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998), focused on the disruption to an appellee's expectations when it struck down as unconstitutional a statute that required companies formerly in the coal industry to retroactively assume responsibility for coal miners' benefits. The Court majority focused on the absence of a time limitation on the retroactive reach of the statute in holding it unconstitutional. Four justices, the plurality of the Court, resolved the issue on takings grounds so the Court did not reach the question "whether the Coal Act violates due process in light of the Act's severely retroactive impact." *Eastern Enter.,* 524 U.S. at 537, 118 S.Ct. 2131. Drawing from due process retroactivity jurisprudence, however, the plurality opinion admonished "[o]ur decisions ... have left open the possibility that legislation might be unconstitutional if it imposes severe retroactive liability on a limited class of parties that could not have anticipated the liability, and the extent of that liability is substantially disproportionate to the parties' experience." *Id.* at 528–29, 118 S.Ct. 2131. Justice Kennedy, concurring in the judgment and comprising the fifth vote for the majority, wrote that he would have found the Coal Act unconstitutional as a violation of due process because the Act bears no legitimate relation to support the statute and "in creating liability for events which occurred 35 years ago the Coal Act has a retroactive effect of unprecedented scope." *Id.* at 549, 118 S.Ct. 2131. Justice Kennedy emphasized that the due process right against retroactive legislation reflects the Court's "recognition that retroactive law making is a particular concern for the courts because of the legislative 'temptation to use retroactive legislation as a means of retribution against unpopular groups or individuals.'" *Id.* (*quoting Landgraf,* 511 U.S. at 266, 114 S.Ct. 1483).

**B.**

 Applying these principles concerning whether the "retroactive application [of

the statute] is so harsh and oppressive as to transgress constitutional limits," *Carlton,* 512 U.S. at 30, 114 S.Ct. 2018, we hold that Ubaldo–Figueroa established that he had a plausible ground of relief for challenging his removal order; the explicit retroactive application of IIRIRA § 321 raises serious due process concerns.[12] The purpose of the statute according to the government is unlike any other the Court has approved of in upholding retroactive legislation. Furthermore, the retroactive reach of IIRIRA § 321 is not limited in time or scope. IIRIRA § 321 irrationally sweeps in and disrupts the expectations and lives of thousands of immigrants and their families because of their conduct far into the past.

IIRIRA § 321 first raises due process concerns because Congress did not explain in the statute or in the legislative record why it chose to apply the expanded aggravated felony definition retroactively to persons who had committed crimes well before IIRIRA's enactment. *See* S. 1664, 104th Cong. §§ 101(a)(43), 244(a)(1)(A), 24(a)(2)(E) (1996) (printed in S.Rep. No. 1004–249, at 88–90, 125–26 (1996)). Congress's silence on the rationale for retroactive application of § 321 is troubling because the Court requires that Congress have an independent rationale as to why a statute should be applied retroactively. *Usery,* 428 U.S. at 17, 96 S.Ct. 2882 ("The retrospective aspects of legislation, as well as the prospective aspects, must meet the test of due process, and the justifications for the latter may not suffice for the former."). The Court has consistently relied on legislative history to determine whether the purpose of a retroactive statute was justified by a legitimate independent rationale.[13] Without any accompanying explanation, we are left to speculate why Congress applied § 321 retroactively. Such guesswork is especially troublesome because the Court requires that retroactive legislation be "conditioned upon a rationality requirement beyond that applied to other legislation." *Bowen,* 488 U.S. at 223, 109 S.Ct. 468 (Scalia, J., concurring) (citing *Pension Benefit Guaranty Corp.,* 467 U.S. at 730, 104 S.Ct. 2709; *Usery,* 428 U.S. at 16–17, 96 S.Ct. 2882).[14]

---

**12.** This court has upheld the retroactivity of IIRIRA § 321 on other grounds, but none of these cases examined a due process challenge to the retroactive application of § 321. *Park v. INS,* 252 F.3d 1018, 1025 (9th Cir.2001) (statutory construction principles); *Aragon–Ayon v. I.N.S.,* 206 F.3d 847, 851–52 (9th Cir.2000) (same). *See also United States v. Maria–Gonzalez,* 268 F.3d 664, 670 (9th Cir. 2001) (en banc), *cert. denied, Maria–Gonzalez v. United States,* 535 U.S. 965, 122 S.Ct. 1382, 152 L.Ed.2d 373 (2002) (under principles of statutory construction defendant's prior conviction, which was not an aggravated felony at the time he was convicted, could be relied upon to impose enhanced sentence under § 1326 because his prior conviction qualified as an aggravated felony under IIRIRA at the time of his illegal reentry).

**13.** *See, e.g., Carlton,* 512 U.S. at 34, 114 S.Ct. 2018 (examining legislative history of tax statute to conclude that Congress intended to pass subsequent retroactive statute to close loophole in previous statute); *General Motors Co.,* 503 U.S. at 184–85, 112 S.Ct. 1105 (tracing events and legislative history that led state legislature to pass retroactive curative measure to the worker's compensation statute); *Pension Benefit Guaranty Corp.,* 467 U.S. at 723–25, 104 S.Ct. 2709 (reviewing Congressional history to determine rationale for retroactively extending liability to employers who withdrew from pension plans); *Harisiades v. Shaughnessy,* 342 U.S. 580, 72 S.Ct. 512, 96 L.Ed. 586 (1952) (examining Congress's concern with prior Communist activity and national security in reviewing whether retroactive deportation statute based on prior Communist activity is constitutional).

**14.** *See also Mojica v. Reno,* 970 F.Supp. 130, 169 (E.D.N.Y.1997) (holding that retroactively eliminating § 212(c) relief is unconstitutional under the Due Process Clause of the Fifth Amendment in part because "[w]ithout any guidance from Congress, the court may be

The government answers Congress's silence on why it applied § 321 retroactively by arguing that Congress could have concluded that the "population of [aliens with criminal convictions] had reached a point where the line needed to be redrawn to increase the group of criminal aliens subject to removal." Congress, according to the government, could have reasoned that a theft offense that carries a one year sentence was a better measure of determining who should be deported from the United States than a theft offense that carries a five year sentence. Assuming, arguendo, that Congress believed that more "criminal aliens" needed to be deported does not explain why Congress *retroactively* reclassified removable offenses to render removable aliens who had committed an offense at any time in the past, however remote. Does the government consider all such immigrants dangerous to society? Such a belief is plainly irrational because it sweeps in a broad class of immigrants who have committed a crime at some time in the remote past, no matter how young they were when they committed the offense, no matter how they have straightened out their lives, no matter whether they have become loyal hardworking employees, good neighbors, taxpayers, and an asset to their communities, and no matter whether they have married, cared for their American-born children, etc. It is arbitrary to assume that all such persons threaten our society because they committed a crime at some time in the past.[15]

For Congress to pass legislation that inflicts an additional penalty on a legal permanent resident who has already been punished for engaging in criminal conduct poses a risk that Congress may be using retroactive legislation as a means of exacting additional retribution against groups or individuals who are the focus of public hostility. *See St. Cyr,* 533 U.S. at 315, 121 S.Ct. 2271, ("The Legislature's unmatched powers allow it to sweep away settled expectations suddenly and without individualized consideration. Its responsivity to political pressures poses a risk that it may be tempted to use retroactive legislation as a means of retribution against unpopular groups or individuals.") (quoting *Landgraf,* 511 U.S. at 266, 114 S.Ct. 1483). Aliens are at risk "because [as] noncitizens [they] cannot vote, [and] they are particularly vulnerable to adverse legislation."[16] *St.*

tempted to analogize to discover possible purposes supporting retroactivity. Such an exercise in hypotheticals is not generally permissible.").

**15.** *See also Mojica,* 970 F.Supp. at 169 (holding that the retroactive elimination of § 212(c) relief violated due process because the "[r]etroactive application would create a situation in which people who have lived in the community, have established themselves as valuable members of society, and who are needed to support their families, are summarily deported without regard to the present and future interests of their families or the community at large."); Nancy Morawetz, *Symposium: Understanding the Impact of the 1996 Deportation Laws and the Limited Scope of Proposed Reforms,* 113 HARV. L. REV. 1936, 1937 ("Indeed, changing the rules is contrary to well-entrenched conceptions of justice. It is also simply irrational to ignore rehabilitation shown through years of work and family life.").

**16.** The Court has long recognized that immigrants are susceptible to discriminatory treatment based on their status. *See, e.g., Plyler v. Doe,* 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) (The class of undocumented immigrants "raises the specter of a permanent caste of undocumented resident aliens, encouraged by some to remain here as a source of cheap labor, but nevertheless denied the benefits that our society makes available to citizens and lawful residents. The existence of such an underclass presents most difficult problems for a Nation that prides itself on adherence to principles of equality under law."). In addition, the Court has recognized

*Cyr,* 533 U.S. at 316 n. 39, 121 S.Ct. 2271 *citing* Legomsky, *Fear and Loathing in Congress and the Courts: Immigration and Judicial Review,* 78 TEXAS L. REV. 1615, 1626 (2000). *See also Tasios v. Reno,* 204 F.3d 544 (4th Cir.2000) (considering immigrants unpopular group in statutory retroactivity analysis). The Court has long recognized that society considers those who commit crimes, apart from their immigration status, as an unpopular group. For this reason, the Court flatly prohibits retroactive criminal statutes under the Ex Post Facto Clause; to "restrict[ ] governmental power by restraining arbitrary and potentially vindictive legislation." *Landgraf,* 511 U.S. at 266, 114 S.Ct. 1483 (quoting *Weaver v. Graham,* 450 U.S. 24, 28–29, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981)).

In addition, the government's justification for the retroactive application of § 321 is unlike other justifications for retroactive legislation that the Court has considered sufficient under the Due Process Clause. Congress did not retrospectively apply § 321 to cure defects in prior legislation, as in *Carlton* and *General Motors.* Nor does deporting aliens who were previously not deportable spread the costs of a current social problem, as in *Usery.*

IIRIRA § 321 also raises serious due process concerns because there is no temporal limitation on IIRIRA § 321. *Carlton,* 512 U.S. at 32, 114 S.Ct. 2018.

Section 321 thus implicates the purpose behind the Court's requirement for time restrictions on retroactive legislation because § 321 fails to give immigrants "finality and repose" for the legal consequences of their past conduct. *Carlton,* 512 U.S. at 37–38, 114 S.Ct. 2018 (O'Connor, J., concurring). Immigrants, like Ubaldo–Figueroa, who have committed non-deportable crimes in the past, have built families, bought properties, married, reared children—all with the settled expectation that they had borne the consequences of their prior criminal conduct.

In addition, § 321 profoundly disrupts the expectations of legal permanent residents who, with the consent of the prosecution, chose to plead guilty to crimes that did not render them deportable. Many legal aliens, like Ubaldo–Figueroa, pleaded guilty to a certain offense relying on the then-existing immigration consequences of their conviction. *St. Cyr,* 533 U.S. at 322, 121 S.Ct. 2271 (citing *Magana–Pizano v. INS,* 200 F.3d 603, 612 (9th Cir.1999) ("That an alien charged with a crime . . . would factor the immigration consequences of conviction in deciding whether to plead or proceed to trial is well-documented.")). As stated earlier, when Ubaldo–Figueroa negotiated his plea agreement he reasonably believed that his guilty plea would not have an adverse consequence on his immigration status.[17] By retroactively increas-

---

that "a bare congressional desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." *Department of Agriculture v. Moreno,* 413 U.S. 528, 534, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973).

**17.** As the Court observed in *St. Cyr,* by disrupting an alien's expectations guiding their plea agreement the government alters the *"quid pro quo* between a criminal defendant and the government. In exchange for some perceived benefit, defendants waive several of their constitutional rights (including the right to a trial) and grant the government numer-

ous tangible benefits, such as promptly imposed punishment without the expenditure of prosecutorial resources." *St. Cyr,* 533 U.S. at 321–22, 121 S.Ct. 2271.

Furthermore, as one scholar notes, the new grounds for deportation extend to lesser offenses, which "reach into parts of the criminal justice system where it has been routine for lawyers and judges to treat cases relatively casually. In a situation where no one expected the stakes to be high, a case may well have been disposed of in minutes." Nancy Morawetz, *Rethinking retroactive deportation laws and the Due Process Clause,* 73 N.Y.U. L.

ing the legal 15147 consequences to be bourne by an immigrant who enters a guilty plea, IIRIRA § 321 contravenes "elementary considerations of fairness [that] dictate that individuals have an opportunity to know what the law is and conform their conduct accordingly."[18] *Landgraf,* 511 U.S. at 265, 114 S.Ct. 1483.

Finally, the retroactive application of the statute raises the harsh consequences that the Due Process Clause protects against, because it renders deportable legal residents who have established their lives, their families, and their futures in United States. *See United States Trust Co. v. New Jersey,* 431 U.S. 1, 17 n. 13, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977). The Supreme Court has expressly described deportation as a "harsh measure," *I.N.S. v. Cardoza–Fonseca,* 480 U.S. 421, 448, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987), that "may result in loss of . . . all that makes life worth living." *Ng Fung Ho v. White,* 259 U.S. 276, 284, 42 S.Ct. 492, 66 L.Ed. 938 (1922). Deportation is considered "a drastic measure and at times the equivalent of banishment or exile." *Fong Haw Tan v. Phelan,* 333 U.S. 6, 10, 68 S.Ct. 374, 92 L.Ed. 433 (1948).

The government relies on *Harisiades* for the propositions that § 321 does not offend due process and that we have limited power to review § 321. In *Harisiades,* the Court upheld against a due process challenge the Alien Registration Act of 1940, 54 Stat. 670. That Act retroactively made immigrants mandatorily deportable for membership in an organization advocating overthrow of the Government by force and violence. *Harisiades,* however, was decided about seven years after the end of World War II, when in many quarters there was a perceived foreign and internal Communist threat. At that time, the Court took a hands-off policy when it came to immigration statutes that related to a perceived threat to national security. The Court stated:

> Under the Conditions which produced this Act, can we declare that congressional alarm about a coalition of Communist power without and Communist conspiracy within the United States is either a fantasy or a pretense? This Act was approved by President Roosevelt on June 28, 1940, when a world war was threatening to involve us, as soon it did. Communists in the United States were exerting every effort to defeat and delay our preparations. Certainly no responsible American would say that there were then or are now no possible grounds on which Congress might believe that Communists in our midst are inimical to our security.

*Id.* at 590, 72 S.Ct. 512. Because the Court in *Harisiades* was examining policies such as the Alien Registration Act, that are so "vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government," the Court stated that Congress's immigration enactments are *"largely immune* from judicial interference." *Id.* at 588–589, 72 S.Ct. 512 (emphasis added). The Court did not back

---

REV. 97,119 (1998). Ubaldo–Figueora's 1993 conviction which formed the basis of his removal order illustrates this point because he was sentenced to only 90 days home-confinement and three years probation.

**18.** *See also* Jill Fisch, *Retroactivity and Legal Change: An Equilibrium Approach,* 110 HARV. L. REV. 1055, 1102 (1997) (noting

that retroactivity creates the most social cost when it upsets a stable equilibrium because the longer a rule is in effect, and the longer people have had to build their lives around that rule, the more disruptive it will be if the government is permitted to reach back and alter that rule).

away from examining the rationale behind the statute, however, and concluded that "[i]f Communist aggression creates such hardships for loyal citizens, it is hard to find justification for holding that the Constitution requires that its hardships must be spared the Communist alien." *Id.* at 591. This case, in contrast, concerns the constitutionality of a statute that retroactively made immigrants deportable for theft, fraud, misdemeanors, and similar petty offense punishable for more than a year—crimes that have no relation to national security or the government's war power.[19] Finally, *Harisiades*, decided in 1952, also pre-dates the requirement that Congress provide a distinct rationale to justify the retroactive application of legislation.[20] Thus, Ubaldo–Figueroa makes a plausible claim that § 321 may not be applied retroactively.

### C.

▮ Ubaldo–Figueroa raises one additional "plausible" claim to establish that he was prejudiced by the IJ's failure to inform him that he could appeal his removal order: Ubaldo–Figueroa argues that he was eligible for relief from removal under former INA § 212(c)—even though Congress eliminated § 212(c) relief before Ubaldo–Figueroa was put into removal proceedings. Ubaldo–Figueroa relies on *St. Cyr*, in which the Court held that repeal of § 212(c) relief did not retroactively apply to immigrants who were ordered deported based on convictions that predated the repeal of § 212(c). The government argues that Ubaldo–Figueroa was not eligible for § 212(c) relief when he pled guilty because the offense to which he pled was not then classified as an aggravated felony. We rejected this argument in *United States v. Leon–Paz*, 340 F.3d 1003 (9th Cir.2003). In *Leon–Paz*, we held that aliens like Ubaldo–Figueroa are entitled to § 212(c) relief even though they were not eligible for such relief when they pled guilty to their crimes—crimes which were later reclassified as aggravated felonies pursuant to IIRIRA § 321. Thus, under *Leon–Paz*, Ubaldo–Figueroa is eligible for § 212(c) relief.

▮ Moreover, in this case, the district court heard testimony and arguments regarding Ubaldo–Figueroa's eligibility for relief under § 212(c) and determined that he had not made a showing of prejudice. Where, as here, the record regarding the equities to be balanced under § 212(c) is

19. This case is also unlike *United States v. Yacoubian*, 24 F.3d 1 (9th Cir.1994), where we upheld a statute that retroactively made deportable aliens who "at any time after entry ... have been convicted of possessing or carrying in violation of any law any firearm or destructive device." *Id.* at 6. Unlike IIRIRA § 321, *Yacoubian* dealt with a statute that retroactively made deportable those immigrants who were convicted of a narrow class of dangerous crimes; the petitioner in *Yacoubian*, for example, was made deportable for his conviction of three counts of possession and transportation of explosive materials as part of his participation in a conspiracy to place an explosive device in front of the offices of the Turkish Consul in Pennsylvania. *Id.* at 3. In addition, the statute's legislative history was available to assist us in determining the rationale for the retroactive reach of the statute. *Id.* at 6.

20. The additional cases that the government cites to for the proposition that courts have upheld retroactive immigration statutes are inapposite to this case because the statutes were not challenged on due process grounds. *Mulcahey v. Catalanotte*, 353 U.S. 692, 693, 77 S.Ct. 1025, 1 L.Ed.2d 1127 (1957) (statutory interpretation); *Marcello v. Bonds*, 349 U.S. 302, 314, 75 S.Ct. 757, 99 L.Ed. 1107 (1955) (ex post facto); *Lehmann v. United States ex rel. Carson*, 353 U.S. 685, 690, 77 S.Ct. 1022, 1 L.Ed.2d 1122 (1950) (statutory interpretation); *United States v. Arzate–Nunez*, 18 F.3d 730, 733–35 (9th Cir.1994) (ex post facto).

complete and the district court has already decided the issue of prejudice, we need not remand to the district court for further consideration. *See, e.g., United States v. Gonzalez–Valerio,* 342 F.3d 1051 (9th Cir. 2003) (considering the unusual or outstanding equities in a § 212(c) claim on the evidence presented before the district court even though the district court did not consider these equities in the first instance); *cf. Leon–Paz,* 340 F.3d at 1007 (remanding because the district court "never reached" the issue of prejudice). The record on appeal shows that Ubaldo–Figueroa has been gainfully employed since he came to the United States, and his employer has the highest regard for his work ethic. He has substantial family ties in the United States, including a United States citizen wife and two United States citizen children, which "is a weighty factor in support of the favorable exercise of discretion under § 212(c)." *Kahn v. INS,* 36 F.3d 1412, 1413 (9th Cir.1994). The record also includes evidence of the active role that Ubaldo–Figueroa has taken in his children's education and upbringing. The equities in Ubaldo–Figueroa's favor are significant. Thus, we conclude that Ubaldo–Figueroa had a plausible claim for relief and that the IJ's unconstitutional failure to inform him that he was eligible for § 212(c) relief prejudiced him. *See, e.g., Arrieta,* 224 F.3d at 1081–83 (reviewing the record developed below, determining that petitioner had a plausible claim for relief under § 212(h), and reversing the district court's decision).

Because Ubaldo–Figueroa could have pursued his claim that the retroactive application of IIRIRA § 321 is unconstitutional and because, alternatively, he could have sought § 212(c) relief had his underlying removal hearing been constitutionally adequate, his removal order cannot stand as a basis for his convictions.

## CONCLUSION

We AFFIRM the district court's decision that Ubaldo–Figueroa suffered a due process violation in his underlying removal proceedings and REVERSE the district court's ruling that Ubaldo–Figueroa was not prejudiced by his constitutionally defective removal proceeding. We thus REVERSE his convictions under 8 U.S.C. § 1326.