**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

XOCHITL CISNEROS-RODRIGUEZ,
*Defendant-Appellant*.

No. 13-10645

D.C. No.
5:11-cr-00744-DLJ-1

OPINION

Appeal from the United States District Court
for the Northern District of California
D. Lowell Jensen, Senior District Judge, Presiding

Argued and Submitted
March 12, 2015—San Francisco, California

Filed December 23, 2015

Before: William A. Fletcher and Morgan Christen, Circuit
Judges and Roslyn O. Silver,[*] Senior District Judge.

Opinion by Judge W. Fletcher;
Dissent by Judge Silver

---

  [*] The Honorable Roslyn O. Silver, Senior District Judge for the U.S. District Court for the District of Arizona, sitting by designation.

## SUMMARY[**]

---

### Criminal Law

Reversing a criminal judgment, the panel remanded with instructions to dismiss an indictment and vacate the defendant's conviction for illegal reentry.

The panel held that if an Immigration and Customs Enforcement agent erroneously advises an uncounseled alien in an administrative removal proceeding that an attorney will not be able to provide assistance, any waiver of the right to counsel based on that advice is invalid. The panel held that an ICE agent therefore obtained an invalid waiver of the defendant's right to counsel, in violation of due process, when he advised the defendant that an attorney would not have been able to help her when she was facially eligible for a U-visa, a form of hardship relief available to a person convicted of an aggravated felony.

The panel further held that the defendant was prejudiced by the due process violation because it was plausible that she would have obtained a U-visa had she applied for one, notwithstanding the fact that she had already been placed in administrative removal proceedings.

Dissenting, District Judge Silver wrote that the district court made credibility findings, and that deference to the district court's determination that the defendant was not credible is required; that the law governing administrative

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

removal proceedings would have prevented the defendant from staying, vacating, or converting the proceedings; and that the defendant has not carried the burden to establish she plausibly would have been granted a U-visa.

## COUNSEL

Varell Laphalle Fuller (argued), Assistant Federal Public Defender, Federal Public Defender's Office, San Jose, California, for Defendant-Appellant.

Barbara Valliere, Chief, Appellate Division, Anne M. Voigts (argued), Assistant United States Attorney, Office of the United States Attorney, San Francisco, California, for Plaintiff-Appellee.

## OPINION

W. FLETCHER, Circuit Judge:

Xochitl Cisneros-Rodriguez ("Cisneros"), an undocumented alien, was convicted in 2009 of violating California narcotics laws and was subsequently placed in administrative removal proceedings. She was told by the Immigration and Customs Enforcement ("ICE") agent who conducted the proceeding that, because she had been convicted of an aggravated felony, an attorney could not help her. She was ordered removed in 2010. When Cisneros returned to the United States without permission in 2011, she was criminally charged with illegal reentry. She moved in the district court to dismiss the indictment on the ground that her 2010 removal order was fundamentally unfair because her

due process rights had been violated. The district court denied the motion and Cisneros was convicted of illegal reentry.

We hold that the ICE agent who conducted Cisneros's administrative removal proceeding violated her due process rights by telling her that an attorney would not have been able to help her when she was facially eligible for a U-visa, a form of hardship relief available to a person convicted of an aggravated felony. We further hold that Cisneros was prejudiced by the due process violation because it was plausible that Cisneros would have obtained a U-visa had she applied for one in 2010, notwithstanding the fact that she had already been placed in administrative removal proceedings. We therefore reverse and remand with instructions to dismiss the indictment and vacate the conviction.

## I.  Background

### A.  Factual Background

Xochitl Cisneros-Rodriguez is a 32-year-old Mexican national who was brought to the United States as a child and has lived here, undocumented, for most of her life. She is married and has two sons. Her husband and sons are all United States citizens.

As a young adult, Cisneros had several encounters with the criminal justice system. She has been convicted of a number of California state misdemeanors. She has also been convicted of felony and misdemeanor fraud.

In 2006, Cisneros's car was stolen by a woman named Monalisa Rodriguez. Cisneros reported the theft, and

Rodriguez was convicted of larceny and served time in prison. One night in October 2008, after Rodriguez had been released from prison, she came to Cisneros's home with a knife. She called Cisneros a "snitch" and claimed she would hurt Cisneros's family if Cisneros did not "pay her back" by helping her sell methamphetamine. Over the next three months, until January 2009, Cisneros helped Rodriguez sell methamphetamine in and around San Jose, California. Rodriguez repeatedly threatened Cisneros during this period, hitting her on three separate occasions and telling her that if she did not cooperate, Rodriguez would hurt members of her family.

In January 2009, Cisneros and Rodriguez were arrested and charged with possession of methamphetamine for sale. The two women were both incarcerated at the Elmwood Correctional Facility in Santa Clara County. While incarcerated, Rodriguez repeatedly threatened Cisneros with violence, both to extort money and to dissuade her from testifying against Rodriguez. Approximately a week after the arrest, Rodriguez instructed Cisneros to call her mother and tell her to wire $300 to Rodriguez's prison commissary account. If Cisneros did not do so, Rodriguez said, Cisneros would get "beat up." When Cisneros's mother did not send the money, Rodriguez took Cisneros to a bathroom in the prison and assaulted her. Cisneros's mother then sent the money. Rodriguez then demanded that she send an additional $300.

In February, the jail staff moved Cisneros into another dormitory in the jail, and later moved her into protective custody. Rodriguez continued to harass Cisneros, sending her threatening notes through other inmates. One note instructed Cisneros to "keep saying the dope was yours in court."

Another instructed her to tell her mother to send additional money, adding, "Or do I need some one [sic] to go see your brother?"  The harassment continued into the fall.  In September, jail staff observed inmates "striking [Cisneros] in the head multiple times with both fists."  A report from that incident states that Cisneros suffered "multiple contusion[s] [to the] back of [her] head."  When shown a photograph of Rodriguez by an investigator, Cisneros said, unprompted, "Oh my god, she scares me."  She said that Rodriguez made her "go through hell."

Around May 2009, as a result of reports by Cisneros and her mother, the Santa Clara County Sheriff's Office referred the case to the District Attorney.  In December 2009, Cisneros testified at a preliminary hearing on extortion and other criminal charges brought against Rodriguez.  The other witnesses at the hearing were Cisneros's mother and an investigating officer.  At the close of the hearing, the judge found probable cause to issue an information charging Rodriguez with one felony count of extortion, one felony count of dissuading a witness by use of force, and one count of misdemeanor battery.  Cisneros was listed as the victim of all three crimes.  In February 2010, Rodriguez entered a plea of nolo contendere to the charges and was sentenced to a year in prison, in addition to any sentence imposed on the methamphetamine charges.

Cisneros ultimately pled guilty to two counts of possessing a controlled substance for sale in violation of California Health and Safety Code § 11378, arising out of the January 2009 arrest and a prior arrest in November 2008.  She was sentenced to one year of incarceration for each count.

### B.  Immigration Proceedings

On January 20, 2009, the day after she and Rodriguez were arrested, Cisneros was referred to ICE.  She was interviewed at the Elmwood Correctional Facility by ICE Agent Steven Contreras.  Contreras recorded on a form that Cisneros had been born in Mexico; that she had entered the United States without inspection; and that she was married. In October 2009, after Cisneros had pled guilty to violating California narcotics laws, ICE Agent Jose Linares reopened her file in order to prepare for removal proceedings.  He recommended that ICE place Cisneros into administrative removal proceedings.  Administrative removal proceedings are conducted by ICE agents rather than Immigration Judges.

On May 20, 2010, Cisneros was transferred to an ICE facility, where she was placed in an administrative removal proceeding conducted by Agent Linares.  Part of what occurred on May 20 is disputed.  Specifically, the parties dispute what Linares told Cisneros about her right to hire an attorney and whether he told her that an attorney would not help her.  But the following facts are undisputed.  Linares served Cisneros with an arrest warrant and a Notice of Intent to Issue a Final Administrative Removal Order.  Cisneros signed the notice, admitting the charge of removability and waiving her right to contest it.  She then signed a form admitting to having entered the United States unlawfully in 1994 and waiving her right to an attorney.  Linares testified that the entire proceedings likely took somewhere between ten and fifteen minutes.  Cisneros testified that the proceedings took about ten minutes.

Cisneros was removed to Mexico on the following day pursuant to a final administrative order of removal.

### C.  District Court Proceedings

Cisneros returned to the United States without permission sometime in 2011.  She was arrested in October 2011 and criminally charged with illegal reentry in violation of 8 U.S.C. § 1326.  In December 2011, represented by counsel, Cisneros filed an application with U.S. Citizenship and Immigration Services ("USCIS") for a U-visa, a form of hardship relief available to victims of crimes who have suffered mental or physical abuse and are helpful to law enforcement officials in prosecuting or investigating the crime.  *See* Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, § 1513, 114 Stat. 1464, 1533.  As part of her application, Cisneros was required to obtain certification from a law enforcement officer that she had assisted in prosecuting a qualifying crime.  A detective from the Santa Clara County Sheriff's Office certified that Cisneros had assisted in prosecuting Rodriguez for extortion.

In district court, Cisneros moved to dismiss the indictment on the ground that her due process rights had been violated in the administrative removal proceeding on May 20, 2010.  She argued that her waivers of her rights to appeal and to counsel had not been "knowing and voluntary" because Agent Linares had not followed ICE procedures and had affirmatively misadvised her about her right to counsel and about the help an attorney could have provided.  The district judge noted that he generally resolved motions to dismiss an indictment in a § 1326 case "on the basis of affidavits," but that in this circumstance he would hold an evidentiary hearing.  In the hearing that followed, Cisneros and Linares testified about the circumstances of Cisneros's removal.

Cisneros testified that on May 20 Agent Linares had instructed her to sign forms without indicating to her what they were.  According to Cisneros, when Linares handed her the notice on which she admitted her removability, he had folded over the first page which contained the charge itself, and he had pre-checked the boxes admitting the charge and waiving her right to contest it.  She testified that Linares did not translate the charges or allegations into Spanish, and that he did not tell her she had the right to rebut or contest the allegations or to appeal his decision.  She also testified that, had he told her these things, she would have contested her removal.  She testified that Linares had told her "that if I wanted to leave in the plane that was about to leave that I would have to sign this [notice]."  She described Linares's tone as "Just harsh.  Quick.  Rude."

Cisneros testified that Agent Linares had affirmatively misadvised her about whether she could speak to an attorney, and about whether an attorney would help her.  ICE is required by regulation to provide aliens in removal proceedings with a list of free legal services.  *See* 8 C.F.R. § 238.1(b)(2)(iv).  She testified that she was "certain" that Linares had not provided her with such a list.  Cisneros further testified that Linares did not tell her that she had a right to hire an attorney and told her that because she "had big charges" she "could not see a judge."  In her affidavit filed in the district court, Cisneros testified that Linares told her that "a lawyer would not help me, so I did not ask for an attorney."

Cisneros testified on direct examination that she had told Agent Linares during the May 20 interview that she "had an extortion case in which I had been a victim."  On cross examination, however, the government sought clarification

because Cisneros's written declaration seemed to indicate that she had not told Linares about her extortion case. Cisneros clarified that she had mentioned her extortion case to someone other than Linares:

> Q: So going back to your declaration, it states that you explained to an officer, and the way the declaration is written, it appears to be someone other than Agent Linares. You explained that you had an extortion case.
>
> A: Okay. That question that you asked . . . , when I was looking at the immigration people that were present, I remember that he interviewed me in January, but it was — well, it was another person who came when I was already under protection. It wasn't the same person.

Cisneros testified further that she had mentioned her extortion case to someone other than Contreras.

> Q: So it was not either of the two gentleman [sic] you saw [in court] on Thursday [Agent Linares or Agent Contreras]?
>
> A. The first one was — I don't remember, his name is like Contreras. All right. He went to see me when I was already in the dorms, but it wasn't him I said to — well, that I speak about the fact that I had a problem with extortion.
>
> Q: Okay.

Agent Linares testified that he had no recollection of what happened on May 20. He conceded that he had no memory of Cisneros and no memory of her removal proceeding. Linares was asked, "Do you recognize her?" He answered, "No." Linares was then asked, "Do you have any personal memory of her?" He again answered, "No." Linares was finally asked, "[Y]ou have no personal memory of these proceedings . . . ?" He answered, "No, no." Linares said that it was "difficult for [him] to remember each particular case" because he "process[es] so many."

Agent Linares testified as to what he "would ordinarily have done" in conducting an administrative removal proceeding. He testified that his ordinary practice is to read the allegations and charge to the alien; that he ordinarily explains everything on the notice to the alien, including that the alien has a right to an attorney; and that he believed, based on his ordinary practice, that he would have provided Cisneros with a list of free legal service providers. Linares further testified, again based on what he described as his ordinary practice, that because Cisneros spoke Spanish, he would have conducted the removal proceedings in Spanish. On cross-examination, Linares admitted that, although he had testified to what he described as his "ordinary practice," Cisneros's administrative removal proceeding had been only the "second or third" such proceeding he had ever conducted. Linares also admitted that when he conducted Cisneros's administrative removal proceeding, he had recently been disciplined and demoted to the position in which he conducted administrative removal hearings.

The district judge issued a written order denying Cisneros's motion to dismiss the indictment. The judge identified the key question as whether Cisneros's due process

rights had been violated during her administrative removal proceedings, a question as to which he wrote that "the testimony is in conflict." The judge wrote that "[a]s Linares testified that it is his habit to provide all aliens he processes with a list of attorneys, the Court finds it unlikely that none of the aliens being processed at this time were so provided." However, at the same time, the judge "acknowledge[d] that evidence of disciplinary action taken against Linares by ICE was introduced as impeachment during cross-examination." The judge wrote that "Cisneros Rodriguez'[s] testimony about her desire to have counsel was inconsistent at best." But the district court made no adverse credibility finding as to either Cisneros or Linares.

With respect to whether Cisneros told Linares about her extortion case and the possibility of a U-visa, the district judge wrote, "The Court finds that there is no credible evidence in the record that defendant told Linares that she wanted to see a lawyer or an immigration judge because she thought she had the basis for an application for a U-Visa, or even that she had been a victim of extortion." He wrote, a few pages later, "[T]here is nothing at all in the record to suggest that in their meeting Cisneros Rodriguez told Linares about the extortion case, or her desire to file for a U Visa." The judge explained the basis for these statements, pointing out that Cisneros herself had testified on cross examination, when the government sought clarification of her testimony, that she had told neither Linares nor Contreras of her extortion case or any wish to apply for a U-visa.

The district judge found that "[Cisneros] and Linares had a discussion about counsel." But the important question, he explained, was "whether in these discussions Linares provided [Cisneros] with information which was inaccurate

or misleading and which therefore interfered with her right to counsel." With respect to this question, he concluded that "based on the information available to Linares about Cisneros Rodriguez'[s] criminal record, assuming *arguendo*, Linares did tell Cisneros Rodriguez that a lawyer could not help her, the Court finds that, as a factual matter, Linares did not mislead [Cisneros]." That is, the district court reasoned that even "assuming *arguendo*" that Agent Linares told Cisneros that an attorney would be of no use, as Cisneros testified, there was no due process violation because Linares's advice was correct.

Based on his conclusion that there had been no due process violation, the district judge denied Cisneros's motion to dismiss the indictment. After a bench trial, Cisneros was convicted of violating 8 U.S.C. § 1326, and was sentenced to 30 months in prison.

Cisneros appealed the denial of her motion to dismiss the indictment. After she was convicted and while her appeal was pending, her application for a U-visa was denied.

## II. Standard of Review

We review the district court's denial of a motion to dismiss an indictment brought pursuant to 8 U.S.C. § 1326(d) de novo. *United States v. Reyes-Bonilla*, 671 F.3d 1036, 1042 (9th Cir. 2012). We review the district court's findings of fact for clear error. *Id.*

## III. Discussion

"To convict an alien criminal defendant of illegal reentry under 8 U.S.C. § 1326, the government must prove that the

alien left the United States under order of exclusion, deportation, or removal, and then illegally reentered." *United States v. Barajas-Alvarado*, 655 F.3d 1077, 1079 (9th Cir. 2011) (internal footnote omitted). An alien charged with illegal reentry under § 1326 "has a Fifth Amendment right to collaterally attack [her] removal order because the removal order serves as a predicate element of [her] conviction." *United States v. Ubaldo-Figueroa*, 364 F.3d 1042, 1047 (9th Cir. 2004); *see also United States v. Mendoza-Lopez*, 481 U.S. 828, 837–38 (1987). That right is codified at 8 U.S.C. § 1326(d).

To mount a collateral attack under § 1326(d),

> a defendant must, within constitutional limitations, demonstrate (1) that [she] exhausted all administrative remedies available to [her] to appeal [her] removal order, (2) that the underlying removal proceedings at which the order was issued improperly deprived [her] of the opportunity for judicial review, and (3) that the entry of the order was fundamentally unfair.

*Ubaldo-Figueroa*, 364 F.3d at 1048; *see* 8 U.S.C. § 1326(d).

The parties agree that the third question, whether the entry of Cisneros's removal order was "fundamentally unfair," is dispositive here. *See United States v. Gomez*, 757 F.3d 885, 892 (9th Cir. 2014) (noting that "[a] defendant can establish the first two prongs of § 1326(d) by showing that he was denied judicial review of his removal proceeding in violation of due process"); *Ubaldo-Figueroa*, 364 F.3d at 1049–50 (to similar effect). An underlying order is "fundamentally

unfair" if (1) a defendant's due process rights were violated by defects in her underlying deportation proceeding, and (2) she suffered prejudice as a result of the defects. *Ubaldo-Figueroa*, 364 F.3d at 1048. If Cisneros's final order of removal was entered in violation of her due process rights, and if she suffered prejudice as a result, she is deemed to have "exhausted all administrative remedies available to [her]" and to have been "deprived . . . of the opportunity for judicial review." *See id.* at 1048. For the following reasons, we hold that the entry of the order was fundamentally unfair.

## A.  Due Process Violation

The district judge wrote that he was willing to assume that Cisneros testified truthfully when she said that Agent Linares advised her that an attorney could not help her. Cisneros argues that Linares's advice violated her due process rights, on the ground that he thereby improperly obtained an invalid waiver of her right to counsel. We agree.

"Although there is no Sixth Amendment right to counsel in an immigration hearing, Congress has recognized it among the rights stemming from the Fifth Amendment guarantee of due process that adhere to individuals that are the subject of removal proceedings." *Tawadrus v. Ashcroft*, 364 F.3d 1099, 1103 (9th Cir. 2004). This right extends to administrative removal proceedings. Indeed, ICE is required by statute to inform aliens placed in administrative proceedings of their right to counsel. *See* 8 U.S.C. § 1228(b)(4)(B) ("[T]he alien shall have the privilege of being represented (at no expense to the government) by such counsel, authorized to practice in such proceedings, as the alien shall choose."); 8 C.F.R. § 238.1(b)(2)(i) ("[The Notice of Intent] shall advise that the

alien: has the privilege of being represented, at no expense to the government, by counsel of the alien's choosing . . . .").

A waiver of counsel must be "knowing and voluntary." *See United States v. Ramos*, 623 F.3d 672, 682 (9th Cir. 2010). Improperly obtaining such a waiver constitutes a due process violation. *Id.*; *see also Reyes-Bonilla*, 671 F.3d at 1045–46. "The government bears the burden of proving valid waiver in a collateral attack of the underlying removal proceedings." *Ramos*, 623 F.3d at 680. We "indulge every reasonable presumption against waiver" and do not "presume acquiescence in the loss of fundamental rights . . . , especially where an *uncounseled* individual purportedly waived" her right to counsel. *Gomez*, 757 F.3d at 894 (internal citations and quotation marks omitted).

The Record of Sworn Statement form that Cisneros signed on May 20 stated that she had "the right to consult with an attorney." The second question on the form asks, "Are you willing to waive these rights and talk with me?" "Sí" ("yes") is written on the form in answer to that question. But Cisneros testified that, before she gave this answer, Linares had dissuaded her from hiring an attorney. Specifically, she testified that Linares told her that an attorney "would not help [her]." She testified further that, had Linares not dissuaded her from exercising her right to counsel, she would have hired an attorney.

A waiver of fundamental rights, we have repeatedly held, "must be considered and intelligent." *Gomez*, 757 F.3d at 893 (internal quotation marks omitted); *see also Reyes-Bonilla*, 671 F.3d at 1043; *Ramos*, 623 F.3d at 680. It is difficult to comprehend how an unrepresented alien could execute a "considered and intelligent" waiver of her right to

counsel if she has been informed by an ICE agent, just prior to executing the waiver, that the exercise of that right would be futile.

The district judge did not make a factual finding that Agent Linares had told Cisneros that an attorney could not help her. Instead, he simply assumed that Linares had done so. The judge nonetheless held that there had been no due process violation because, he wrote, "as a factual matter, Linares did not mislead [Cisneros]." In the district judge's view, that is, Linares's statement that an attorney could not help her was accurate. However, as we explain below, Linares's advice was not accurate, and had the effect of misleading Cisneros. We hold that if an ICE agent erroneously advises an uncounseled alien in an administrative removal proceeding that an attorney will not be able to provide assistance, any waiver of the right to counsel based on that advice is invalid because it is not "considered and intelligent."

Because the district judge was mistaken when he concluded that Agent Linares's advice was correct, a critical question becomes whether, in fact, Linares advised Cisneros that an attorney could not help her. The district judge assumed that Linares had so advised Cisneros but he made no factual finding to that effect. We would ordinarily remand to the district court to allow the district judge who heard the live testimony to do factfinding. In this case, however, we think it appropriate to decide the factual issue ourselves.

The district judge who decided this case has retired. If we were to remand to the district court for factfinding, the district judge assigned the case on remand would be in no better position than we are to decide the factual question. That

judge would read the transcript, as we can, and would not be able, any more than we are able, to judge the credibility of Cisneros based on personal observation. It is possible, of course, that the district judge assigned the case on remand would elect to rehear the testimony taken by the first judge. But given that Cisneros has now been removed and is currently in Mexico, the likelihood that the new judge would conduct a hearing at which the key witnesses, including Cisneros, would testify is sufficiently remote that we are unwilling to remand based on an assumption that the new judge would do so.

Cisneros testified that Agent Linares told her that an attorney "would not help [her]." Linares could not directly contradict Cisneros because, as he testified, he had no recollection of her or her proceeding. He testified about his ordinary practice, and testified that his practice was to explain to aliens in such proceedings that they have the right to counsel. But Linares's testimony was suspect. He admitted that Cisneros's removal was only the "second or third" administrative removal proceeding he had ever conducted. Further, on cross-examination he conceded that he was conducting administrative removal proceedings in San Jose as a result of having been demoted from his previous position as ICE Chief of Detention in San Francisco. He had been demoted because, contrary to ICE regulations, he had kept in a safe in his office between 260 and 300 bags of aliens' personal possessions, and because he had made false accusations against, and derogatory and discriminatory statements about, a fellow ICE employee. As a result of the false accusations and the statements, ICE had been obliged to pay $50,000 to the affected employee. Linares's termination had been proposed during the disciplinary process, but in the end he was only demoted and transferred.

Cisneros testified consistently that she had wanted an attorney.  She stated that she was "certain" that she had not been provided with a list of attorneys.  And she testified without ambiguity or hesitation that Linares had advised her that an attorney could not help her.  While she was halting and uncertain regarding whether and when she told the ICE agents that she had been the victim of extortion, she was consistent in her statements that she had intended to retain an attorney until Linares told her that an attorney could not help.

Our dissenting colleague concludes that the district judge made an implicit credibility finding, and found that Cisneros testified falsely on the key question in the case.  She writes, "[R]eading the opinion as a whole, the district court found Cisneros incredible regarding what Linares told her about counsel."  Our colleague bases her conclusion on two statements by the district judge.  First, she points out that the judge wrote that there was "no credible evidence in the record that [Cisneros] told Linares . . . that she had been a victim of extortion."  We agree with this statement by the district judge, but it does not amount to an explicit, or even an implicit, credibility finding.  As the district judge recognized in explaining the statement, Cisneros herself testified that she had not told Linares (or Contreras, for that matter) that she had been a victim of extortion.  Second, our dissenting colleague points out that the judge found it "unlikely that none of the aliens being processed at this time were . . . provided [with lists of counsel]."  We are willing to agree with this statement by the district judge, too, but it is not, any more than the first statement, an adverse credibility finding "regarding what Linares told [Cisneros]."  The judge referred to the likelihood that *none* of the aliens was provided with counsel lists; the court found that "unlikely."  Even if that had been the question before the court, the most the judge found

was it was "unlikely" that Linares never provided a counsel list to any alien. But that was not a question before the court. The question was whether a particular alien — Cisneros — had been provided with such a list, and whether Linares had told her that an attorney could not help her.

Based on our independent review of the record, we conclude that Agent Linares told Cisneros that an attorney would not help her and thereby persuaded Cisneros to waive her right to obtain an attorney. We therefore hold that Linares obtained an invalid waiver of Cisneros's right to counsel, in violation of her due process rights.

## B.  Prejudice

That Cisneros's Fifth Amendment due process rights were violated does not end the inquiry. In order to show that her administrative removal proceeding was "fundamentally unfair," she must show that she was prejudiced by the violation. *See Ubaldo-Figueroa*, 364 F.3d at 1048. Cisneros contends that she was prejudiced by the due process violation because, had she obtained counsel, it is plausible that she would have applied for and obtained a U-visa, a temporary visa available to certain crime victims. *See* 8 U.S.C. § 1101(a)(15)(U). The government concedes that Cisneros was facially eligible for a U-visa in 2010. But it argues that Cisneros nonetheless could not have been prejudiced by a due process violation. First, the government argues that Cisneros was statutorily barred from applying for any form of relief, including a U-visa, because she had been put in administrative removal proceedings. Second, the government argues that, even if Cisneros was not barred by statute, it is not plausible that she would have obtained a U-visa had she applied for one in 2010. We disagree with both arguments.

### 1.  Statutory Bar

The general rule is that a defendant who has been convicted of an aggravated felony "cannot show that [s]he was prejudiced by defects in [her] underlying [removal] proceedings . . . because noncitizens convicted of aggravated felonies are . . . ineligible for almost all forms of discretionary relief." *United States v. Alvarado-Pineda*, 774 F.3d 1198, 1201 (9th Cir. 2014) (internal citations omitted). Cisneros, however, argues that she falls within an exception to the rule. Cisneros argues that she was eligible for a U-visa, a form of relief available to victims of certain qualifying crimes who have suffered mental or physical abuse and assist in the prosecution or investigation of the crime. *See id.* at 1201–02; *see also* Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, § 1513, 114 Stat. 1464, 1533. Conviction for an aggravated felony does not necessarily disqualify an applicant from obtaining a U-visa. An applicant for a U-visa may apply to waive grounds that would ordinarily bar her admission to the United States, including certain criminal convictions. 8 U.S.C. § 1182(d)(14).

An applicant for a U-visa must demonstrate that (1) she has suffered "substantial physical or mental abuse" in connection with a qualifying crime; (2) she possesses information concerning the crime; (3) she "has been helpful, is being helpful, or is likely to be helpful" to an official who is investigating or prosecuting the crime; and (4) the qualifying crime violated federal or state law. *See* 8 U.S.C. § 1101(a)(15)(U)(i). A U-visa applicant must obtain a certification from a law enforcement official in order to qualify for the visa. 8 C.F.R. § 214.14(c)(2)(i). It is undisputed that Cisneros met these criteria. She was the

victim of extortion, a qualifying crime; she had suffered abuse in connection with the crime; and, as the certification she received from the Santa Clara County Sheriff's Office attests, she had rendered substantial assistance in the prosecution of the crime's perpetrator, Rodriguez. The government nonetheless argues that, as a statutory matter, Cisneros was not eligible to obtain a U-visa, and therefore could not have been prejudiced by any due process violations.

Under 8 U.S.C. § 1228, the government may place an undocumented alien convicted of an aggravated felony either into removal proceedings before an Immigration Judge or into administrative removal proceedings before an ICE agent. *See* 8 U.S.C. § 1228(b)(1). The governing regulations explicitly state that an ICE agent shall place an undocumented alien in administrative removal proceedings, rather than removal proceedings before an Immigration Judge, only if he is "satisfied that there is sufficient evidence" that the alien is eligible to be placed in these proceedings. 8 C.F.R. § 238.1(b)(1). The regulations further permit an ICE agent to transfer an undocumented alien to removal proceedings before an Immigration Judge if the agent "finds that the alien is not amenable to removal" by administrative removal proceedings. *Id.* § 238.1(d)(2)(iii). Agent Linares testified before the district court, consistent with these regulations, that he had the authority to determine, subject to his supervisors' approval, whether Cisneros would be placed and kept in administrative removal proceedings or transferred to removal proceedings before an Immigration Judge.

The government argues that, once Agent Linares decided to place Cisneros in administrative proceedings rather than proceedings before an Immigration Judge, her right to apply for a U-visa was irrevocably extinguished. The government

relies on 8 U.S.C. § 1228(b)(5), which provides that an undocumented alien placed in administrative removal proceedings will not "be eligible for any relief from removal that the Attorney General may grant in the Attorney General's discretion." 8 U.S.C. § 1228(b)(5). The fatal weakness of the government's argument is that an ICE agent can take an undocumented alien already put in administrative removal proceedings out of those proceedings and put her into removal proceedings before an Immigration Judge. Indeed, the regulations explicitly provide that authority, and Agent Linares conceded in his testimony in the district court that he could have exercised it. *See* 8 C.F.R. § 238.1(d)(2)(iii). Therefore, while an undocumented alien placed into administrative removal proceedings may be barred from applying for discretionary relief during those proceedings, the bar is contingent on the agent's decision to place and keep her in those proceedings.

Our prior opinions in *United States v. Calderon-Segura*, 512 F.3d 1104 (9th Cir. 2008), and *United States v. Garcia-Martinez*, 228 F.3d 956 (9th Cir. 2000), are not to the contrary. In those cases, we noted that undocumented aliens convicted of aggravated felonies could not have been prejudiced by due process violations because under § 1228(b)(5) they were "statutorily ineligible for any discretionary relief." *Calderon-Segura*, 512 F.3d at 1108; *see also Garcia-Martinez*, 228 F.3d at 964. But neither defendant identified a form of relief, like the U-visa, that he plausibly could have obtained had he been placed or transferred into proceedings before an Immigration Judge. By contrast, in *United States v. Reyes-Bonilla*, we engaged in an extensive analysis of whether it was plausible that the defendant would have obtained deferral of removal under the Convention Against Torture, one of the few other forms of relief available

to an undocumented alien convicted of an aggravated felony. *See* 671 F.3d at 1050–52. We did not treat the fact that the defendant had been placed into administrative proceedings as a bar to all relief from removal, notwithstanding the text of § 1228(b)(5). We instead asked the same question we ask today: whether the defendant had identified a form of relief it was plausible he would have obtained absent the due process violation. In many cases, such as in *Calderon-Segura* and *Garcia-Martinez*, the answer will be "no." But the reason for that answer is not that the defendant has been placed into administrative removal proceedings.

We therefore reject the government's argument that § 1228(b)(5) operates as an absolute bar to a undocumented alien placed in administrative removal proceedings. We hold, instead, that an undocumented alien attacking an administrative removal order may argue that a due process violation that occurred during her removal proceedings was prejudicial if (a) she identifies a form of relief for which she was eligible to apply, notwithstanding her aggravated felony conviction, and (b) she establishes that it was "plausible" that, but for the due process violation, she would have been permitted to apply for, and would have obtained, such relief. Such a situation is rare, but § 1228(b)(5) does not foreclose the possibility of relief.

## 2. Plausibility

To succeed in demonstrating that her 2010 removal order was fundamentally unfair, Cisneros must show that she was prejudiced by the due process violations in the underlying removal proceedings. To do so, Cisneros "does not have to show that [she] actually would have been granted relief." *Ubaldo-Figueroa*, 364 F.3d at 1050. "Instead, [she] must

only show that [she] had a 'plausible' ground for relief from deportation." *Id.* (quoting *United States v. Arrieta*, 224 F.3d 1076, 1079 (9th Cir. 2000)). "[E]stablishing 'plausibility' requires more than establishing a mere 'possibility.'" *Barajas-Alvarado*, 655 F.3d at 1089. But Cisneros "need not prove that relief was *probable*." *United States v. Raya-Vaca*, 771 F.3d 1195, 1207 (9th Cir. 2014) (emphasis added). That is, Cisneros needs to show that relief was more than "possible," but she need not show that it was "probable."

Here, Cisneros must show that, but for the due process violation, it is both "plausible" that she would have been permitted to apply for a U-visa in 2010 and "plausible" that she would have obtained one had she applied. We conclude that she has made both showings.

First, we have little trouble concluding it is plausible that, had Agent Linares not told Cisneros that a lawyer would not help her, she would have been able to apply for a U-visa. The government does not dispute that Cisneros would have been able to apply for a U-visa had she not been placed into administrative proceedings. And Linares conceded that, had he known Cisneros was eligible for a U-visa, he would have so informed his supervisors. We have no doubt, as the district court concluded, that Linares did not know that Cisneros was facially eligible for a U-visa. We also have no doubt that a competent lawyer would have discovered that she was eligible for one, would have informed ICE, and would thereby have prevented Cisneros's immediate removal from the United States. Indeed, a formal Department of Homeland Security ("DHS") policy memorandum states that it is DHS's policy to stay the proceedings and removal of an alien who is facially eligible for a U-visa, even after he or she has been issued a final order of removal. *See* Memorandum

from Peter S. Vincent, Principal Legal Advisor, U.S. Immigration & Customs Enforcement to the Office of the Principal Legal Advisor (Sept. 25, 2009), *available at* http://1.usa.gov/1GqVkYK. Had Cisneros been granted a U-visa subsequent to the issuance of the removal order, the removal order would have been canceled. *See* 8 C.F.R. § 214.14(c)(5)(i).

Second, although this is a closer question, we conclude that it is plausible that Cisneros would have obtained a U-visa had she applied for one in 2010. According to data compiled by DHS, USCIS ultimately grants over 70 percent of U-visa applications. *See Number of I-918 Petitions for U Nonimmigrant Status (Victims of Certain Criminal Activities and Family Members) by Fiscal Year, Quarter, and Case Status 2009–2015*, U.S. Citizenship & Immigration Serv., *available at* http://1.usa.gov/18LyQG3. Though "statistics alone cannot establish the plausibility of relief," *Raya-Vaca*, 771 F.3d at 1209, the data provides a reasonable baseline against which to assess the plausibility of relief in Cisneros's individual case.

Measured against that baseline, we find it plausible that Cisneros would have obtained a U-visa in 2010. It is true that Cisneros had a substantial criminal record. Although the record is not entirely clear, it appears she was convicted of a variety of state misdemeanors and felonies. But until the fall of 2008, when she became involved with Rodriguez, Cisneros had never been involved in any drug-related crime and had never been sentenced to more than nine months in county jail. Further, there were significant reasons why Cisneros might have warranted a favorable exercise of discretion. She had lived most of her life in the United States; she was married to a U.S. citizen; and she was raising two U.S. citizen children.

Cisneros had also been a critical witness in the prosecution of Rodriguez for extortion. The government argues to us that Rodriguez's crime was relatively minor, and that Cisneros's role in assisting the Santa Clara County Sheriff's Office was not substantial. To some extent, the government is making a counterfactual argument, for Cisneros was both the victim of, and the primary witness against, Rodriguez. Further, we see nothing in the text or history of the Victims of Trafficking and Violence Protection Act that would support the government's limited reading of the purpose and availability of U-visas. Congress's purpose in establishing the U-visa was to protect "[*a*]*ll* women and children who are victims of [qualifying] crimes," not merely those who have information or assistance to provide regarding high-profile crimes. *See* Pub. L. No. 106-386, § 1513(a)(1)(B), 114 Stat. 1464, 1533 (2000) (emphasis added). Congress also intended to "strengthen the ability of law enforcement agencies to detect, investigate, and prosecute" all qualifying crimes, not merely those crimes that the government might conclude in retrospect, and in the context of later litigation, are significant. *Id.* § 1513(a)(2)(A).

Finally, we do not accord significant weight to the fact that Cisneros later applied for a U-visa and was rejected. Like the petitioner in *Torres-Tristan v. Holder*, 656 F.3d 653, 655 (7th Cir. 2011), upon which the government relies, Cisneros applied for a U-visa only after she had already violated 8 U.S.C. § 1326 by re-entering the United States. *See id.* at 655. The fact that USCIS rejected her application after she had been criminally convicted in 2013 of illegal reentry has little bearing on whether she would have been successful had she applied for a U-visa in 2010, before she had been ordered removed and before her subsequent re-entry.

We conclude that had Cisneros applied for a U-visa in 2010, it was plausible that she would have obtained one.

Conclusion

Based on the foregoing, we conclude that the entry of Cisneros's administrative removal order in 2010 was "fundamentally unfair." We hold that Cisneros's due process rights were violated when Agent Linares told her that an attorney would not help her. We also hold that Cisneros was prejudiced by the violation because, in its absence, it was plausible that she would have been transferred from administrative removal proceedings to removal proceedings before an immigration judge, and that she would then have sought and obtained a U-visa. We therefore reverse and remand with instructions to dismiss Cisneros's indictment and vacate her conviction.

**REVERSED** and **REMANDED** with directions. Cisneros's motion to supplement the record on appeal is denied as moot.

SILVER, District Judge, dissenting:

Having fully evaluated the many statutes, regulations, and policies at issue, as well as the record and opinion of the district court, I regretfully must dissent from the majority.

I find the district court did make credibility findings and determined Cisneros was not credible. Under the applicable standard of review, deference is required. Also, I believe the law governing administrative removal proceedings would

have prevented Cisneros from staying, vacating, or converting the proceedings. Finally, although I agree that with assistance of counsel, Cisneros theoretically could have petitioned for and received a decision regarding a U-visa prior to her removal from the United States, I disagree that Cisneros has carried the burden to establish she plausibly would have been granted a U-visa. Accordingly, I dissent.

## I. Due Process

On the issue of due process, the majority concludes the "critical question" is whether "Linares advised Cisneros that an attorney could not help her" and that the district court did not decide this question. However, reading the entirety of the district court opinion in context, I find the district court did decide this question and, based on the record before this court, that determination is entitled to strong deference. Alternatively, even if the district court did not decide this question, this court is required to remand for resolution of all underlying factual issues.

### A.  The District Court's Factual Findings

All parties concede the district court made factual findings regarding Cisneros's right to counsel. Cisneros's opening brief on appeal argues the district court was incorrect in finding Cisneros was properly advised of her rights. The reply brief repeats this argument, stating the district court "credited Agent Linares' testimony" and relied on "clearly erroneous factual findings" in concluding Agent Linares properly advised Cisneros of her rights. The government's brief also claims the district court made factual findings regarding Cisneros's right to counsel.

I agree the district court did not explicitly and expressly reject Cisneros's testimony that Linares affirmatively dissuaded her from obtaining an attorney. But reading the opinion as a whole, the district court found Cisneros incredible regarding what Linares told her about counsel. Assuming the district court's factual findings were only implicit rather than explicit, with both parties agreeing factual findings were made, this court is required to review those findings under the normal standard of review: clear error. *See United States v. Kinsman*, 540 F.2d 1017, 1019 (9th Cir. 1976), *withdrawn on other grounds*, 573 F.2d 3 (9th Cir. 1978) (district court's implicit factual findings must be reviewed for clear error). Furthermore, a district court's credibility findings are entitled to a high degree of deference. *See Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575 (1985) ("When findings are based on determinations regarding the credibility of witnesses, Rule 52(a) demands even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said."). This deference precludes an appellate court from substituting a preferred opinion of the evidence: "[I]f the district court's findings are plausible in light of the record viewed in its entirety, [we] cannot reverse even if [we are] convinced [we] would have found differently." *United States v. Torlai*, 728 F.3d 932, 937 (9th Cir. 2013) (citation omitted).

The majority's analysis of the district court's credibility findings is contrary to the well-established required deference in two respects. First, it adopts a rule of construction without support in law that a district court must credit all or none of a witness's testimony. Second, the district court found the

portions of Cisneros's testimony regarding the information she received about her right to counsel explicitly not credible.

The record shows at one point, Cisneros testified she told Linares she had been the victim of extortion. But the district court remarked there was "no *credible* evidence in the record that [Cisneros] told Linares . . . that she had been a victim of extortion." (emphasis added). The district court also rejected Cisneros's testimony regarding her right to counsel and held:

> As it relates to the issue of [Cisneros] having access to an attorney, the testimony is in conflict. Linares testified that at their meeting he would have provided [Cisneros] with a list of legal counsel. Defendant testified that Linares never gave her, or any of the other two person [sic] being processed at the same time a list of lawyers. As Linares testified that it is his habit to provide all aliens he processes with a list of attorneys, *the Court finds it unlikely that none of the aliens being processed at this time were so provided*. . . [FN 3] While the Court makes this finding, it also acknowledges that evidence of disciplinary action taken against Linares by ICE was introduced as impeachment during cross-examination.

(emphasis added). Based on the findings cited above, it is clear the district court did not believe Cisneros was telling the truth about the actions and statements she alleged Linares made in connection to Cisneros's right to counsel. And while some may disagree with that view of Cisneros's testimony, it is a plausible conclusion based on the entire record of the

hearing. *See, e.g.*, *Carrion v. Smith*, 549 F.3d 583, 590 (2d Cir. 2008) (discussing Fed. R. Evid. 406 and affirming district court reliance on testimony of "established practice" in making findings of fact).

### B. Alternatively, Remand Is Usually Required to Address a Lack of Factual Findings

Even if we were to decide the district court did not make an explicit factual finding deemed somehow necessary, an appellate court is "not in the business of making findings of fact." *Forest Grove Sch. Dist. v. T.A.*, 638 F.3d 1234, 1238 (9th Cir. 2011). In fact, according to the Supreme Court, when a district court has not made the necessary findings of fact, "the usual rule is that there should be a remand for further proceedings to permit the trial court to make the missing findings." *Pullman-Standard v. Swint*, 456 U.S. 273, 291–92 (1982). "The only exception to this rule is when the record permits only one resolution of the factual issue." *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 387 n.3 (2008). As previously stated, my reading of the record compels the conclusion that the district court found Cisneros did not testify truthfully. Therefore, remand rather than appellate fact finding is the only course.

The majority offers two reasons for not remanding. First, the district judge who conducted the evidentiary hearing has since retired and, second, an appellate court must accept as true any statement offered by a witness which is not directly contradicted. The second reason cannot be right, and I am not aware of any law requiring a district court accept all testimony as credible. And as for the first reason, the majority posits the "district judge assigned the case on remand would be in no better position than we are to decide the factual

question." That is also an incorrect appellate standard of review. On remand, a different district judge may opt to take additional evidence, such as additional testimony from Cisneros and Linares.[1] The district judge on remand may also seek additional documents which could either support or undermine Cisneros's allegations. Simply, credibility is impossible to judge on appeal—on the paper record. The demeanor of witnesses is a critical advantage of the district court judge but not appellate judges. *Hernandez v. New York*, 500 U.S. 352, 365 (1991) ("As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province.'"). And of course, it is not unheard of for a case to be assigned to a new district judge on remand. The fact that this particular district judge is no longer available to hear the case cannot support our foray into appellate fact finding.

## II. Prejudice

Even assuming Agent Linares told Cisneros an attorney would not be able to help her, Cisneros has not shown she

---

[1] Even though Cisneros has been deported, her counsel must continue to have contact with her, otherwise this appeal on her behalf would be improper. *See Marrow v. United States*, 772 F.2d 525, 530 (9th Cir. 1985) (citing *ABA Standards for Criminal Justice* 4-8.2, 21-2.2 (2d ed. 1980)) ("The decision whether to appeal 'must be the defendant's own choice'"); *Dep't of Water & Power of City of Los Angeles v. Anderson*, 95 F.2d 577, 580 (9th Cir. 1938) (stating appeal would be dismissed if it appeared attorneys appearing for appellant had no authority to conduct case for appellant). And while she may not be able to enter the country to testify, a district judge may permit her to offer testimony by telephone or videoconference. *Cf. Maryland v. Craig*, 497 U.S. 836 (1990) (finding testimony via one-way video monitor did not violate confrontation clause).

experienced prejudice from that statement.**[2]** It is not plausible that, absent this comment by Linares, Cisneros would have been able to convince ICE to convert her removal from administrative to non-administrative proceedings. Second, it is not plausible, had she been able to stay her removal, that she would have been granted a U-visa and avoided deportation.

## A. Cisneros Could Not Have Avoided Administrative Removal

Once Cisneros was convicted of aggravated felonies in June 2009, the Notice for administrative proceedings was approved in October 2009, and the Notice was served in May 2010, Cisneros's options for challenging her administrative removal were, by statute and case law, extremely limited. The type of relief Cisneros claims she could have sought and the type of relief the majority holds she might have obtained (i.e. a U-visa) is implausible. A relatively detailed examination of administrative removal proceedings proves the point.

Under 8 U.S.C. § 1228(b), the Attorney General has discretion to remove non-Legal Permanent Residents convicted of aggravated felonies through either regular or administrative proceedings. Cisneros concedes she had been convicted of an aggravated felony. Accordingly, the record before the court establishes Cisneros was eligible to be removed through administrative proceedings.

---

**[2]** It is worth noting Cisneros's opening brief contained two short paragraphs on the issue of prejudice which stated only that Cisneros's facial eligibility for a U-visa demonstrated she had plausible grounds for relief and, therefore, suffered prejudice.

Administrative removal proceedings commence when an ICE agent serves a deportable person with a Notice of Intent to Issue a Final Order of Administrative Removal. 8 C.F.R. § 238.1(b)(2)(i). After proceedings commence, the deportable alien may challenge her placement in administrative rather than regular proceedings, but only on very limited grounds. Thus, the majority is correct that "an ICE agent can take an undocumented alien already put in administrative removal proceedings out of those proceedings and put her into removal proceedings before an Immigration Judge." But contrary to the majority's representation, it is not as simple as an ICE agent making this discretionary decision. Instead, a regulation makes clear how and when transfer out of administrative proceedings into regular proceeding is appropriate. According to 8 C.F.R. § 238.1(b)–(d), an ICE agent may transfer a non-citizen whose administrative removal proceeding has begun to non-administrative proceedings if the non-citizen "rebut[s] the allegations supporting the charge" and, upon examination of the evidence, the agent concludes the non-citizen is "not amenable to [administrative] removal." *See* 8 C.F.R. § 238.1(b)–(d). Cisneros has not asserted either of these grounds. Therefore, Cisneros has not identified a plausible or even a possible way she could have been transferred out of the administrative proceedings.

## B. Non-Citizens Cannot Obtain U-Visas While in Administrative Proceedings

Given that Cisneros was properly in administrative proceedings and has not identified any possible way she could have been transferred out of administrative proceedings, she was barred from obtaining any form of discretionary relief while in those proceedings. Under the

language of § 1228(b)(5), Cisneros was statutorily barred from obtaining discretionary relief while in administrative proceedings. I agree with the majority that non-citizens who have been convicted of aggravated felonies are not automatically barred from applying for or obtaining a U-visa. *United States v. Alvarado-Pineda*, 774 F.3d 1198, 1201–1202 (9th Cir. 2014) (citing 8 U.S.C. § 1101(a)(15)(T)). But a non-citizen who is prima facie eligible for a U-visa and has been convicted of an aggravated felony may only obtain discretionary relief (e.g. a waiver of inadmissibility and U-visa) *outside* of administrative removal proceedings, for instance, when as mentioned in *Alvarado-Pineda*, the alien seeks admission to the U.S. from another country. *See Alvarado-Pineda*, 774 F.3d at 1201–1202 (discussing waiver and U-visa as forms of relief from which aggravated felons are not barred when applying for *admission* to the U.S.). In sum, the majority is incorrect that Cisneros could have obtained a U-visa after service of the Notice of Intent to Issue a Final Order of Administrative Removal but before the issuance of the actual Final Order of Administrative Removal—in other words, while she was *in* administrative removal proceedings.

The Ninth Circuit has explicitly recognized the bar on discretionary relief for non-citizens in administrative removal proceedings on at least two occasions. In *United States v. Calderon-Segura*, 512 F.3d 1104, 1108 (9th Cir. 2008), the court held that once placed in administrative proceedings, "a non-[Legal Permanent Resident] aggravated felon subject to expedited removal [is] statutorily ineligible for any discretionary relief." Second, in *United States v. Reyes-Bonilla*, 671 F.3d 1036, 1050 (9th Cir. 2012), it was held an individual "could not receive any discretionary relief from removal because he had been placed in [administrative]

proceedings based on his felony convictions." *See also United States v. Garcia-Martinez*, 228 F.3d 956, 964 (9th Cir. 2000) (holding "deportation was a foregone conclusion" for alien who did not challenge his conviction for an aggravated felony).

In *Reyes-Bonilla*, the court concluded the defendant's "status as an aggravated felon" meant "the only form of immigration relief available to [him] was deferral of removal under CAT." *Reyes-Bonilla*, 671 F.3d at 1050. The majority attempts to read into this a qualification to the bar against discretionary relief in administrative proceedings. But this is a misunderstanding of *Reyes-Bonilla*. The majority states *Reyes-Bonilla* "did not treat the fact that the defendant had been placed into administrative proceedings as a bar to all relief from removal, notwithstanding the text of § 1228(b)(5)." That is correct, but the majority is confusing discretionary and mandatory types of relief. CAT relief is not discretionary, it is mandatory. *Reyes-Bonilla*, 671 F.3d at 1050. Thus, the fact that § 1228(b)(5) did not bar potential, mandatory CAT relief in *Reyes-Bonilla* has no bearing on whether that statute bars discretionary forms of relief, such as waivers of inadmissibility and U-visas.

Overall, the majority ignores the law that created the one-two punch of an aggravated felony conviction coupled with placement in administrative removal proceedings. The majority maintains that because such convictions do not absolutely bar U-visa eligibility, Cisneros could have applied for and received a U-visa even while she was engaged in administrative removal. In reaching this conclusion, the majority relies upon a 2009 DHS policy under which it claims ICE vowed to stay administrative removal proceedings if there were a pending U-visa petition. *See* Memorandum from

Peter S. Vincent, Principal Legal Advisor, U.S. Immigration & Customs Enforcement to the Office of the Principal Legal Advisor (Sept. 25, 2009), *available at* http://1.usa.gov/1GqVkYK. But the majority misreads the policy. The policy does not provide for stays of active *administrative* removal proceedings. Instead, it provides that ICE will stay regular removal proceedings, final orders of removal (resulting from regular proceedings), and final orders of administrative removal (resulting from administrative proceedings).

## C. Cisneros Might Have Applied for a U-Visa and Stay of Deportation After Her Removal Proceedings Closed

The complicated journey through administrative proceedings and the statutory bar of § 1228(b)(5) shows the flaws in the majority's analysis. But there is a more convincing argument, which neither the majority nor Cisneros pursue and which created a possibility of skirting the bar of § 1228(b)(5).

Had Cisneros been advised and obtained an attorney after receiving the Notice of Intent to Issue a Final Order of Administrative Removal, her attorney could have filed a U-visa petition on her behalf and, *after* receiving a Final Order of Administrative Removal ("FARO"), could have applied for a stay of her deportation pending a determination of the U-visa petition. The possibility of applying for a stay of deportation is provided not only in ICE policy, but in regulation: "The filing of a petition for U-1 nonimmigrant status has no effect on ICE's authority to execute a final order, although the alien may file a request for a stay of removal pursuant to 8 CFR 241.6(a) and 8 CFR 1241.6(a)."

8 C.F.R. § § 214.14(c)(1)(ii). Section 241.6(a) states: "[The district director may,] in his or her discretion and in consideration of factors listed in 8 CFR 212.5 and section 241(c) of the Act, []grant a stay of removal or deportation for such time and under such conditions as he or she may deem appropriate." And § 212.5(b) includes "urgent humanitarian reasons" or "significant public benefit." 8 C.F.R. 212.5(b).

In sum, the majority's contention that an attorney could have persuaded ICE to transfer Cisneros out of administrative proceedings or stay her administrative proceedings is erroneous. But no doubt an attorney might have helped Cisneros avoid immediate deportation by filing a U-visa application and an accompanying motion to stay her deportation. This approach, however, is not addressed by the majority nor has Cisneros provided any meaningful briefing on this strategy.[3]

Thus, the best scenario for Cisneros, assuming she had not waived her right to counsel, would have been to obtain an attorney subsequent to her meeting with Agent Linares, then to have immediately met with the attorney who would have had to file applications for a waiver of inadmissibility and a U-Visa, and moved for a stay of her deportation pending their resolution, *and* finally, to hope the stay were granted. Cisneros has not presented any coherent argument that this sequence of events was plausible. But even assuming it were, Cisneros still has not shown it was plausible that after receiving a stay of her deportation she would have been granted a U-visa and avoided removal.

---

[3] The regulations governing post-removal order stays were first brought to the court's attention in a 28(j) letter submitted after the completion of appellate briefing.

**D. Cisneros Has Not Shown She Plausibly Would Have Been Granted a U-Visa**

The majority relies heavily on an alleged general U-visa approval rate of seventy percent in determining Cisneros had a plausible chance of being granted a U-visa. But this statistic does not account for many possible variables among petitioners, including criminal histories, particularly for aggravated felonies.

The rejection by this circuit of general statistics as a means of proving plausibility is embedded in case law. *United States v. Corrales-Beltran*, 192 F.3d 1311, 1318 (9th Cir. 1999) ("[An alien] must make a plausible showing that the Attorney General would have exercised discretion in his favor because of the unique circumstances of his own case."). In *Corrales-Beltran*, the court held even a general statistic showing discretionary relief was granted fifty percent of the time was insufficient to show such relief was plausible with respect to a specific individual with a unique set of circumstances. Instead, the court held, "it would be sheer speculation to conclude, without more, that [the] appeal would have been successful." *Id.* In *United States v. Barajas-Alvarado*, the Ninth Circuit held: "[T]o show 'plausible grounds' for relief, an alien must show that . . . based on the 'unique circumstances of [the alien's] own case,' it was plausible (not merely conceivable) that the [Immigration Judge] would have exercised his discretion in the alien's favor." 655 F.3d 1077, 1089 (9th Cir. 2011). The clear message of these cases is that general statistics are of little help to the court in determining the plausibility of relief for non-citizens challenging their removal. The majority does not explain why a global seventy percent approval rate would

make it plausible for individual relief when the court has previously held a fifty percent general approval rate does not.

This is problematic for another reason. The numbers from which it was calculated are open to several alternative, equally possible interpretations. *See* Number of I-918 Petitions for U Nonimmigrant Status (Victims of Certain Criminal Activities and Family Members) by Fiscal Year, Quarter, and Case Status 2009–2015, U.S. Citizenship & Immigration Services, *available at* http://1.usa.gov/18LyQG3.[4] The majority arrived at the seventy percent statistic by dividing the number of petitions approved and denied in 2010 by the number approved [(10,073/14,420) x 100=69.85%]. But, at the end of 2009, 11,863 petitions were pending. In 2010, 10,742 more petitions were submitted. Out of the 22,605 pending petitions in 2010, 10,073 were approved. By that estimate, the approval rate was forty-five percent. Furthermore, it is unclear from the chart *when* the petitions in each category (approved, denied, pending) were submitted. For example, petitions approved in 2010 could have been hold-overs from those pending in 2009. Finally, the petitions pending in 2009 might have been submitted any time between 2000 (when the U-visa was created) and 2009. Therefore, while it is possible to derive a seventy percent approval rate from analyzing a particular year, it is unclear whether that accurately reflects the reality.

---

[4] The statistics were not part of the record before the district court and were first submitted to this court in a 28(j) letter, even though they had been available for years prior. Furthermore, Cisneros's 28(j) letter contained only raw data for U-visa petitions received, approved, denied, and pending during 2009 and 2010. The seventy percent approval rate was calculated by the majority, not Cisneros.

The marginal value of these statistics is further shown by the complete absence of any information about *why* individuals were approved or denied. We know that in evaluating applications for waivers of inadmissibility, USCIS considers "the number and severity of offenses of which the applicant has been convicted." 8 C.F.R. § 212.17(b)(1)–(2). We do not know why Cisneros's petition was denied but we do know that even without her conviction for reentry after deportation, she had a significant criminal history. The single difference between Cisneros's theoretical U-visa petition before removal and the one she eventually filed is that she illegally reentered the U.S. after she had been deported. The majority appears to have concluded that merely her illegal reentry conviction defeated Cisneros's application, not her lengthy criminal record, including convictions for possession for sale of methamphetamine. We have nothing in the record or law to support this assumption.

The majority explains that the overall approval rate for U-visas, coupled with Cisneros's citizen family members, establishes it was plausible her U-visa application would have been approved. I do not understand the basis for this conclusion. Perhaps the majority means the overall seventy percent approval rate establishes, as a matter of law, that a U-visa was plausible. After all, if someone with a very substantial criminal record such as Cisneros always has a "plausible" case for a U-visa, it would be difficult to see which individuals would not. My impression is that the majority's disregard of the seriousness of the Cisneros's prior offenses is colored by the view that a co-defendant, Rodriguez, allegedly forced Cisneros to sell methamphetamine. But Rodriguez was never convicted of this conduct. The only crime against Cisneros with which Rodriguez was charged was extortion while the two were

incarcerated for their shared drug crime.[5] This prediction should not be based on unsubstantiated assumptions.

Determining the plausibility that a government agency mired in a web of complicated governing law would have granted a single petition over five years ago is difficult. But the party arguing plausibility, in this case Cisneros, always bears the burden of proof. And, despite the possibility that counsel theoretically might have submitted a U-visa petition and stayed Cisneros's removal until the outcome of that petition, Cisneros has not met her burden of showing she had a plausible chance of being granted relief from removal. Therefore, I must dissent.

---

[5] In crediting Cisneros's testimony and her account of coercion, the majority also mischaracterizes or disregards the underlying facts. The majority states, in 2006, Cisneros reported to police that Rodriguez had stolen her car. But Cisneros testified at Rodriguez's extortion hearing that she had never filed a police report regarding the stolen vehicle. Rather, she stated the police had come to her after her vehicle was discovered in connection with a crime involving stolen mail. At that point, despite testifying that she did not witness the crime or have any other substantial contact with or knowledge of Rodriguez, Cisneros said she told police Rodriguez had stolen her car and was responsible for the stolen mail. These facts cast serious doubt on whether we know the full story of Cisneros's relationship with Rodriguez.